**NATIONAL ASSOCIATION FOR the AD-
VANCEMENT OF COLORED PEO-
PLE et al., Appellants,**

v.

**Allen THOMPSON, Mayor of the City of
Jackson, Mississippi, et al., Appellees.**

No. 21741.

United States Court of Appeals
Fifth Circuit.

March 8, 1966.

Rehearing Denied in Court II
April 20, 1966.

Barbara A. Morris, Derrick A. Bell, Jr., New York City, R. Jess Brown, Jack H. Young, Carsie A. Hall, Jackson, Miss., Robert Carter, Jack Greenberg, Leroy D. Clark, New York City, William R. Ming, Jr., Chicago, Ill., Frank D. Reeves, Washington, D. C., for appellants.

Martin R. McLendon, Asst. Atty. Gen., Joe T. Patterson, Atty. Gen., E. W. Stennett, City Atty., Thomas H. Watkins, J. A. Travis, Jr., Robert G. Nichols, Jr., Jackson, Miss., for appellees.

Before WHITAKER, Senior Judge,* and WISDOM and THORNBERRY, Circuit Judges.

WHITAKER, Senior Judge:

This is an action brought in two counts by the corporate plaintiff, a New York corporation, and several individuals, some residing without and some within the State of Mississippi, against various State, county and city officials of the State of Mississippi. In the first count, brought on behalf of the named plaintiffs and those similarly situated, they seek to enjoin the Mayor of the city of Jackson, Mississippi, the City Commissioners, the Chief of Police, the City Prosecuting Attorney, the Commissioner of the State Highway Patrol, the Sheriff of the County in which the city of Jackson is located, and others, from interfering with the free exercise of their civil rights under the Constitution of the United States and certain laws enacted in pursuance thereof. In the second count, they seek a mandatory injunction against the Governor, the Attorney General, and the Secretary of State of Mississippi to require them to permit the corporate plaintiff to domesticate in order to do business in the State of Mississippi.

A court of the United States, quite properly, is loathe to interfere in the internal affairs of a State. The sov-

---

* Of the U. S. Court of Claims, sitting by designation.

ereignty of the States, within the boundaries reserved to them by the Constitution, is one of the keystones upon which our government was founded and is of vital importance to its preservation. But in Clause 2 of Article VI of the Constitution of the United States it is provided:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Hence, any State law, which is in conflict with the United States Constitution or a law enacted by Congress in pursuance thereof, cannot be enforced. Nor can a valid State law be applied in a way to thwart the exercise of a right guaranteed by the Constitution and laws enacted by Congress in pursuance thereof.

So, where it is alleged that certain State laws do so conflict or are being utilized, not for legitimate State purposes, but as an expedient to deprive plaintiffs of the rights guaranteed them by the Constitution of the United States and the laws of Congress enacted under the authority thereof, a court of the United States must entertain the suit and, if the allegations are proven, and injunctive relief appears to be required, it must issue the injunction.

We are of opinion, from a study of the District Court's findings and opinion and of the entire record, that some of the defendants, on a number of occasions, did pervert laws of the State and ordinances of the city from their rightful usage and did use them to deny to plaintiffs rights to which they were entitled under the Constitution and laws of the United States. On the other hand, we are also of the opinion that on many occasions valid State laws and municipal ordinances, enacted for the public safety and convenience, were violated by plaintiffs and that their violation was unnecessary for the full enjoyment of their rights under the Constitution and laws of the United States. The enforcement of these State laws and municipal ordinances on these occasions was a legitimate exercise of the police power of the State. Plaintiffs could not transgress valid State laws or municipal ordinances, enacted and enforced in the exercise of legitimate purposes of the State, in the assertion of rights guaranteed by the Constitution and laws of the United States, if they could assert these rights and still respect the State law. On many occasions they did not have to disregard State law or municipal ordinance to assert their Constitutional rights. See Cox v. State of Louisiana, 379 U.S. 536, at 554, 85 S.Ct. 453, 13 L.Ed.2d 471, and Cox v. State of Louisiana, 379 U.S. 559, at 562 and 563, 85 S.Ct. 476, 13 L.Ed. 2d 487 (1965), and numerous cases there cited.

In the first count of their petition plaintiffs say that since May 27, 1963, they have protested defendants' asserted policy of racial discrimination by (1) picketing places of public accommodation and entering them and demanding service, and when it was refused, by remaining on the premises; (2) by walking along the public streets carrying placards, but not blocking the streets or sidewalks; (3) by praying on the steps of public buildings, but not in a way to deny ingress or egress thereto, and that the defendants, in an effort to break up these demonstrations, have assaulted them, doing them serious bodily harm, and arrested hundreds of them on charges of breach of the peace, restraint of trade, trespass, obstructing traffic, and parading without a license, and requiring them to be tried separately and to post bonds ranging from $100 to $1,000 and sentencing them to pay maximum fines. They allege that they "desire, and intend, to continue to protest against the illegal use of state power by the defendants" and that "the defendants threaten to continue to harass, intimidate, threaten, and otherwise deny to the plaintiffs

the right of peaceful assembly, the right of freedom of speech and of association * * *." Therefore, they pray that defendants be enjoined from preventing them from peacefully and publicly protesting racial segregation in conformity with lawful rules and regulations of the State and municipality.

In the second count plaintiffs allege that the corporate plaintiff has taken all steps, which are enumerated, requisite for domestication in the State of Mississippi, but that its application has not been granted because plaintiff's chief objective is to eliminate all forms of racial discrimination in Mississippi and elsewhere in the United States, and to assist its members and others of the Negro race to protest against such discrimination in various and sundry ways. Wherefore it prays that a mandatory injunction issue against the Governor, the Attorney General, and the Secretary of State to require them to license plaintiff corporation to do business within the State, and for other relief.

In their answers defendants denied all material allegations of the petition.

Thereafter, the case was tried on oral testimony and the affidavits filed pro and con the motion for a restraining order. The District Judge made findings of fact and a conclusion of law, upon the basis of which he dismissed the complaint. He found that on a number of occasions plaintiffs had violated State law and city ordinances in registering their protests against racial discrimination and were arrested and prosecuted therefor; but that some of the plaintiffs had been wrongfully arrested. There is evidence to support these findings, but his findings are quite brief and fail to disclose the course of conduct followed by defendants and by plaintiffs. We think this necessitates a review of the whole record and a brief summary of the credible evidence, although this means extending the length of this opinion much beyond what we like.

For years prior to 1963, the Negro community in the city of Jackson, Mississippi, had grown more and more restive under the policy of racial segregation and discrimination prevailing in that city. Aided and abetted by civil rights organizations and other white and Negro people from within and without the State of Mississippi, they organized what became known as the "Jackson Movement." Its aim was to register the protest of the Negroes against discrimination and to secure for them the equal civil rights to which they thought they were entitled.

In the spring of 1963 Negro citizens, including representatives of several "civil rights" organizations, approached the Mayor of Jackson, Allen Thompson, concerning the formation of a bi-racial committee to negotiate a settlement of grievances of the Negroes in the city of Jackson. When it became apparent that efforts to obtain the formation of a bi-racial committee were doomed to failure, and since it was thought that plaintiffs could not adequately register their grievances through the conventional mediums of the newspapers, radio and television, they decided to, and did, encourage members of the Negro community to participate in boycotting merchants discriminating against them, in picketing, mass meetings, protest marches, and public prayer sessions. These protests and the response of city officials to them are described below.

Appellants urged Negroes in Jackson not to patronize businesses where they were not hired, where they could not be served at lunch counters, where they were not allowed to use restroom facilities, or where they were not addressed with the courtesy titles of Mr., Mrs., or Miss. They were urged to support the campaign by telephone calls, handbills, door-to-door canvassing, and speeches at mass meetings. In addition, efforts were made to picket business establishments on Capitol Street, Jackson's main shopping area, which appellants felt had policies of racial discrimination. The following are illustrative of some of the incidents which involved the picketing.

In December 1962 an interracial group of six persons proceeded to Capitol Street in an automobile with the intention of

picketing the Woolworth and Shainberg stores. On arrival at their destination they got out of the car and put on signs which urged a boycott of Capitol Street because of discriminatory practices. They then started to march back and forth in front of Woolworth's and Shainberg's, walking close to the curb. There was no large crowd attracted by the picketing nor was there any blocking of the entrances to business establishments. Nonetheless, within a short period of time all six persons involved were arrested and charged with parading without a permit and obstructing the sidewalk.

On May 28, 1963, a group of seven attempted to picket on Capitol Street with signs which read "We want equality," "Freedom Day," and "We will overcome." After proceeding about one block, they were stopped by the police and asked if they had a permit to parade. When no answer was given, the entire group was arrested and taken to the city jail.

On May 29, 1963, a group of six, carrying signs which read "Don't shop on Capitol Street," was arrested for obstructing the sidewalk within five minutes after they appeared on the street. It appears from the record that the group was proceeding single file close to the curb and was in no way hindering the flow of traffic on the sidewalk.

On June 7, 1963, five Negroes walking close to the curb and carrying small American flags were arrested for parading without a permit after they had been on Capitol Street only about ten minutes.

On June 14, 1963, one Will Palmer, while walking on Capitol Street, was arrested for parading without a permit, although he was alone at the time and was not carrying any signs or flags. He was, however, wearing a tee-shirt upon which the inscription "NAACP" appeared.

The foregoing are merely illustrative of the picketing incidents which occurred. Many other attempts to picket were made but each resulted in arrest of the participants within a very short period of time after they appeared on the street.

Another type of protest was attempts to use facilities set apart for white people only.

On May 28, 1963, five Negroes entered Primos Restaurant to ask for service. Just as they got inside they were stopped by the owner, were told they were not welcome, and were asked to leave. They refused. Within a short period of time a policeman appeared and asked them to leave. Upon their refusal to do so, all five were arrested for trespass and taken to jail.

On July 19, 1963, four Negro youths sought admission to the YMCA. They were informed by the attendant that that branch of the YMCA was reserved for white people, and after about an hour's discussion they were told to leave. They went outside and sat on the steps, and refused the requests of both the attendant and finally the president to leave. The president then called the police. When the police told them to move, and they did nothing, they were arrested for trespassing on private property.

Another incident, which occurred on May 28, 1963, involved a group of students from Tougaloo College. They entered the Woolworth store and, after purchasing some items, took seats at the lunch counter and ordered hamburgers and coffee. The waitress refused to give them service at that counter but told them that there was a counter for Negroes at the rear of the store where they could be served. When they refused to move, the lights over the counter were turned out and all the area except where the Negroes were sitting was roped off. They continued to sit at the counter for about thirty minutes. During this time a group of spectators, eventually reaching about 200 in number, gathered. Members of this group jeered, threw mustard, catsup, water and anything of a similar nature that was available at those seated at the counter. During all this time there were a number of police officers outside the store but they declined to intervene, despite several re-

quests from the president of Tougaloo College, on the ground that the manager of the store had not requested them to do so. Eventually, one of the spectators, Benny Oliver, pulled one of the students, Memphis Norman, off the stool upon which he was sitting, and kicked him about the stomach, head and back. At this point a plain-clothes policeman stepped in and arrested both Norman and Oliver for disturbing the peace.[1]

Another form of protest was public prayer sessions. The following is a typical example of this type of protest. On May 30, 1963, an interracial group of 13 or 14 assembled on the steps of the Post Office in Jackson to engage in a prayer session. The avowed purpose was to protest the whole system of segregation that existed in Jackson. The demonstration attracted a large crowd of spectators who cursed, jeered, and made a good deal of noise. Within a short period of time the demonstrators were ordered by policemen in the area to break up the prayer session and move on. When they refused, they were arrested and taken to the police station.

The foregoing types of protests resulted, however, in a relatively minor number of the 1,092 arrests in demonstration cases which were made in Jackson from May to the end of the summer of 1963. The greater number of arrests occurred in connection with protest marches carried on during the period.

On May 31, 1963, several hundred students gathered at the Farish Street Baptist Church. After a meeting at which several people spoke, those assembled left the church with the avowed purpose of proceeding to the City Hall to protest discriminatory practices. At the meeting instructions were given to the marchers to march peacefully near the curb in columns of two approximately five yards apart. These instructions were for the most part carried out, although there is a conflict in the evidence

on this point. The marchers proceeded south on Farish Street in the direction of the City Hall. After advancing approximately one and one-half blocks, the marchers were confronted with a line of policemen across Farish Street from sidewalk to sidewalk. A police officer, using a portable loud speaker, asked if they had a permit to parade. After someone in the front of the procession informed the police officer that it was not a parade and hence they thus did not have or need a permit, the officer stated that those who would disperse and move away peacefully would be allowed to do so, but that those who remained would be arrested for parading without a permit. After a good deal of confusion, some 322 people were arrested and transported to temporary jail facilities which had been set up at the fairgrounds.

On June 12, 1963, the day after Medgar Evers, a field representative of the National Association for the Advancement of Colored People, was killed in Jackson, a large group of Negroes assembled in the auditorium of the Masonic Temple on Lynch Street.[2] When one of the speakers asked for volunteers to march, about 150 people, two abreast, filed out of the auditorium and proceeded east, marching in the middle of Lynch Street, one of Jackson's busier thoroughfares, stopping all vehicular traffic thereon. After they had advanced about one-half block they were stopped by policemen drawn out in line, who, after asking if they had a permit to parade, ordered them to disperse. Those who remained in the street, 146 in number, were arrested for parading without a permit and taken to the temporary jail facilities at the fairgrounds.

On June 15 the officials of the city of Jackson issued a parade permit for the funeral procession of Medgar Evers. The funeral procession, consisting of several cars and an ambulance followed by about 5,000 marchers, started at the Masonic

---

1. Subsequently, Oliver was convicted by the City Municipal Judge, fined, and given a jail sentence. The charges against Norman were dismissed.

2. The local headquarters of the NAACP was in this building.

Temple on Lynch Street and proceeded to the Frazier and Collins Funeral Home on Farish Street, a distance of several miles. The march progressed in orderly fashion, without incident, from the Masonic Temple to the funeral home, but shortly after its arrival there, for reasons not entirely clear from the record, other than the tense racial situation that had been created by the death of Evers, pandemonium broke loose. Several hundred people started to advance south on Farish Street toward Capitol Street and Jackson's main shopping area, thus deviating from the proscribed route of the parade permit. They proceeded in a very disorderly manner, completely taking over the sidewalks and the street, shouting, yelling, and throwing rocks, bottles, and bricks. Within a short period of time some of the police in the area formed a line across Farish Street, advancing north along the street, and arresting those with whom they came in contact. Finally, an attorney from the Justice Department and a Negro attorney in the area were able to pacify the demonstrators and, at their request, the police lines were withdrawn and the demonstrators voluntarily dispersed. During the course of this melee, some 22 demonstrators were arrested. Fourteen policemen were injured.

The foregoing, except the Evers funeral incident, are typical illustrations of the protest marches which occurred during the period. The others, of which there were several, followed a similar pattern and concluded similarly.

This brief summary of the evidence shows the course of conduct of the parties in protesting racial discrimination and in responding thereto.

Prior to the passage of the Civil Rights Act of 1964 (78 Stat. 243 et seq.; 42 U.S.C. § 2000a et seq.), the arrest of those persons who refused to leave the premises after having been requested to do so by the owner or his agent, may or may not have been justified, depending on all the facts. Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964). Some of the arrests for picketing may or may not have been justified. (Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949); Hughes v. Superior Court, 339 U.S. 460, 465, 466, 70 S.Ct. 718, 94 L.Ed. 985 (1950); Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)), but others were clearly unjustified. There were only a few arrests for violation of the breach of the peace statute, and these were probably justified.[3] Some of the arrests for obstructing traffic and blocking the sidewalk would appear to have been justified; others were not.

There were two ordinances prohibiting parading without a permit and another concerning the use of the sidewalks. One prohibited parades without a permit therefor issued by the Mayor. The other ordinance and a related one applicable to the use of sidewalks (Sections 134 and 135 of Uniform Traffic Regulations Code), prohibited certain enumerated acts on the streets and sidewalks, including parades, but with the proviso that "the City Council, in its discretion, may grant special permission for parades and other unusual activities on the streets, when, in its opinion, such parades or other activities will not be distracting to the extent of disturbing the usual, normal and customary uses of the streets and would not constitute a disturbance to the people living or conducting businesses thereon." Some of the arrests for violations of these ordinances would seem to have been justified but many were not.

As noted above, the arrests for parading without a permit were not only of the leaders, but of hundreds of the rank and file. When arrested, they were taken to the temporary jail facilities and there detained until bond could be made for each of them. The prosecution insisted on trying each one separately, al-

---

3. Plaintiffs do not attack the validity of this statute, except as the application of it may have encroached on the assertion of their right to protest against racial discrimination.

though the facts relative to one applied to many. This clogged the court's calendar and resulted in the charges hanging over their heads for long periods of time, with eventual conviction a lively prospect.

■ Plaintiffs do not attack the validity of any of the statutes or ordinances; they say only that they were so applied as to deprive them of their right to protest. The record discloses a pattern of conduct on the part of the officials of the city of Jackson that leads us to the conclusion that defendants took advantage of every opportunity, serious or trivial, to break up these demonstrations in protest against racial discrimination, and that a large number of the arrests had no other motive, and some had no justification whatever, either under municipal, State, or Federal law.

■ Nor have we any reason to believe that there is any intention on the part of defendants to desist from such conduct in the future. We have no doubt, from their prior conduct and without any indication of a change of heart, that they still believe such demonstrations must be suppressed and that, in order to do so, they intend to take advantage of any law or ordinance, however inapplicable or however slight the transgression, and to continue to harass and intimidate plaintiffs.

■ Let us, however, issue this caveat to plaintiffs: It was and is incumbent on them to obey valid State laws, properly administered, while asserting their protests. If they do disobey them, they run the risk of justified arrest and prosecution and punishment for doing so.

■ Plaintiffs are entitled to an injunction unless they have an adequate remedy at law.

■ This question gives us concern. We are unwilling to impute to the courts of the State an intention to deprive plaintiffs of any right to which they are entitled under the laws of the State or of the United States, however out of sympathy with some of those laws the court may be. We assume we can rely

on them to safeguard the rights of those brought before them for trial. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); Dombrowski v. Pfister, 380 U.S. 479, 85 S. Ct. 1116, 14 L.Ed.2d 22 (1965). But this does not protect plaintiffs from harassment and intimidation by the law enforcement agencies of the city, county, and State. It does not protect them from arrest *en masse* on frivolous or unfounded charges; it does not protect them from continued arrest and incarceration until bond could be deposited for their release; it does not protect them from the long delay occasioned by the insistence of the prosecution that each one of the hundreds arrested be tried separately; it does not protect them from often expensive litigation until their rights are finally vindicated; it does not protect them from being frightened away from the lawful assertion of their rights and lawful protest against the continued denial of them.

■ We do not think plaintiffs have an adequate remedy at law, and that the District Judge was in error in denying the motion for an injunction and in dismissing the complaint.

In the second count of their petition, plaintiffs complain of the refusal of the Governor to permit the corporate plaintiff, a New York corporation, to domesticate. It is a non-profit, non-share corporation, organized to promote the end of racial discrimination in the various States of the Union. It has been actively engaged in this effort for many years and in many areas of the United States, utilizing boycotts, picketing, mass demonstrations, and other means. Prior to 1963 it carried on these activities in the State of Mississippi through unincorporated affiliates, although it maintained its own office in the State; but in 1962 it received notice from the Secretary of State that the Mississippi Code had been amended, effective January 1, 1963, to require foreign non-profit corporations to domesticate in order to do business in the State. In an effort to comply therewith, it filed a copy of its charter

of incorporation and of a resolution designating an agent for the service of process, both duly authenticated, paid the required filing fees, and applied for domestication.

The Mississippi law provides that upon receipt of an application for domestication, it shall be referred to the Attorney General for his opinion on whether there has been compliance with the law and whether it is to the best interest of the State to grant it or deny it. If he expresses the opinion that it is not in the best interest of the State to grant it, he is required to give his reasons therefor.

Upon receipt of plaintiff's application, the Attorney General wrote the Governor that, upon examination of the application and the statutes of the State, he was of the opinion that the application "is not authorized to be approved by your office." He did not give his reasons therefor.

In the Attorney General's testimony on the trial of this case, he stated that in his opinion he "did not deem it to be to the best interest of the State of Mississippi." He was asked if the requirements of Section 4065.3 of the Mississippi Code, requiring all State officers to undertake to maintain segregation of the races, or if the fact that the purpose of the NAACP was to aid and assist and develop the citizenship rights of Negro citizens without segregation and discrimination were factors influencing his determination. He replied in the negative but added:

> My observation and experience with the NAACP which now covers about fourteen years led me, convinced me, that it is not to the best interest that the NAACP be domesticated, authorized to do business within the State of Mississippi. I have found that the NAACP, like a good many organizations of that kind, do not stick to the stated purposes of their corporate charter but go far beyond what their stated objectives and purposes is [sic]. For instance, your charter says nothing about the method in which the NAACP will employ in attempting to attain their objectives, it says nothing about promoting riotous parades and disorders, inflammatory speeches, meetings and things of that kind that they do indulge in, none of which is referred to of course in the charter of incorporation. That's the reason I said it was not to the best interest of the State of Mississippi for this organization to have the stamp of approval of the State of Mississippi placed upon it.

He said that that was one of the things he took into consideration in arriving at his opinion, but that there were others.

He said that the application for domestication showed that plaintiff did not meet the requirements of Section 5310.1, which provided that three of those who applied for incorporation of a company must be residents of the State of Mississippi. Mr. McLendon, the Assistant Attorney General, said that this was the sole basis for his recommendation that plaintiff's application be denied.

 This latter objection to plaintiff's application is obviously untenable, since Section 5310.1 clearly has no application to foreign corporations seeking domestication. It applies only to persons seeking an original charter from the State of Mississippi. The statute says that corporations *"may * * * be incorporated* on the application of any three members, all of whom shall be adult resident citizens of the State of Mississippi, authorized by any of the said organizations, in its minutes, *to apply for the charter."* [Emphasis supplied.] Manifestly, this has no application to a foreign corporation seeking to domesticate. To so apply it would prevent most, if not all, foreign corporations from domesticating.

Nor is the Attorney General's first reason, stated above, adequate grounds for denying the application. In NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964), the Court in its opening statement in this case said it involved the

right of the NAACP to carry on its activities in Alabama. In 1956 the State Attorney General had filed a bill in equity in the State court to oust the NAACP from the State and the court had issued a temporary restraining order prohibiting it from doing any business in the State and from taking any steps to qualify it to do so. The complaint detailed a number of activities of the defendant corporation, which, it was alleged, justified its ouster, among which were:

> * * * that it had "encouraged, aided, and abetted the unlawful breach of the peace in many cities in Alabama for the purpose of gaining national notoriety and attention to enable it to raise funds under a false claim that it is for the protection of alleged constitutional rights"; [377 U.S. at 303, 84 S.Ct. at 1311]

These acts were alleged

> * * * to be "causing irreparable injury to the property and civil rights of the residents and citizens of the State of Alabama for which criminal prosecution and civil actions at law afford no adequate relief * * *." The complaint stated also that "the said conduct, procedure, false allegations, and methods used by Respondent render totally unacceptable to the State of Alabama and its people the said Respondent corporation and the activities and business it transacts in this State." [377 U.S. at 303, 84 S. Ct. at 1311, 1312]

It will be observed that the reasons given by the Attorney General of Alabama for seeking the ouster of the corporation from the State closely parallel the reasons given by the Attorney General of Mississippi for recommending the disapproval of its application for domestication in that State.

In the case cited, the Court said, at 309, 84 S.Ct. at 1315:

> There is no occasion in this case for us to consider how much survives of the principle that a State can impose such conditions as it chooses on the right of a foreign corporation to do business within the State, or can exclude it from the State altogether. E. g., Crescent Cotton Oil Co. v. State of Mississippi, 257 U.S. 129, 137 [42 S.Ct. 42, 44, 66 L.Ed. 166]. This case, in truth, involves not the privilege of a corporation to do business in a State, but rather the freedom of individuals to associate for the collective advocacy of ideas. "Freedoms such as * * * [this] are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." * * *

Accordingly, the Court reversed the Supreme Court of Alabama, which had approved the order of the lower court ousting the NAACP, and prohibiting it from doing business in the State, and directed it to enter a decree "vacating in all respects the permanent injunction order issued by the Circuit Court of Montgomery County, Alabama, and permitting the Association to take all steps necessary to qualify it to do business in Alabama." (377 U.S. at 310, 84 S.Ct. at 1315.)

We think that this case is controlling here and, on its authority, a mandatory injunction must issue directing the Governor to approve plaintiff's application and directing the Secretary of State to take all needful steps to authorize the plaintiff corporation to do business in the State.

We are of the opinion that the District Court was in error in dismissing plaintiffs' complaint. The judgment of the District Court is reversed and the case is remanded to it with directions to issue the following injunction, the purpose of which is to see to it that the constitutional rights of the plaintiffs are affirmed and protected and that the right and duty of the defendants to maintain the peace are recognized and preserved:

I. The defendants, Allen Thompson, Mayor of the city of Jackson, Mississippi; D. L. Luckey and Tom Marshall, City Commissioners; W. D. Rayfield,

Chief of Police of the city of Jackson; J. L. Ray, Deputy Chief of Police; M. B. Pierce, Assistant Chief of Police; J. A. Travis, City Prosecuting Attorney; R. G. Nichols, Special City Prosecutor; T. B. Birdsong, Commissioner of State Highway Patrolmen; J. R. Gilfoy, Sheriff of Hinds County; and Paul G. Alexander, County Attorney of Hinds County, Mississippi; their successors in office, their agents, servants and employees, are hereby enjoined as follows:

(a) From denying to Negro citizens the right to protest racial discrimination near any place of public accommodation, as defined by the Civil Rights Act of 1964, or near any place, service or facility operated by the State of Mississippi or an agency thereof or in whose operation or maintenance State action is involved, by peacefully in small numbers picketing such establishments in a manner so as not to interfere with pedestrian or vehicular traffic and in a manner so as not to block entrances or exits to or from the picketed establishments;

(b) From denying to Negro citizens equal access to and equal treatment in any place of public accommodation as defined by the Civil Rights Act of 1964, or in any place, service or facility operated or maintained by the State of Mississippi or an agency thereof or in whose operation or maintenance State action is involved;

(c) From denying to Negro citizens the right to participate in protests against racial discrimination in the city of Jackson, Mississippi, in front of any Federal, State, County or Municipal building in small groups of reasonable size and at reasonable times in a manner so as not to interfere with pedestrian or vehicular traffic and in a manner so as not to block entrances thereto or exits therefrom;

(d) From denying to Negro citizens the right to peacefully protest against racial discrimination in the city of Jackson, Mississippi, by peacefully walking upon the public sidewalks of the city of Jackson, observing all traffic signals, walking close to the building line or close to the curb so as not to interfere with or obstruct other pedestrian traffic on the sidewalk, and peacefully assembling in front of any Federal, State, County or Municipal building and speaking out against said discrimination for a reasonable period of time, when traffic to and from places of business or employment is not at its peak, and in such manner as not to block entrances thereto or exits therefrom and as not to unduly disrupt the public peace, and as not to deprive the public of adequate police and fire protection;

(e) From prohibiting or preventing the activities described in paragraphs (a), (b), (c), and (d), supra, by the unreasonable denial of permits or other appropriate permission, and by arrests, threats of arrest, harassment or intimidation.

II. The defendants, Ross R. Barnett, Governor of the State of Mississippi; Joe T. Patterson, Attorney General; and Heber Ladner, Secretary of State; their successors in office, their agents, servants and employees, are hereby required to approve the application for domestication of the NAACP and to take all necessary and proper steps to entitle it to do business in the State of Mississippi.