Anson GRAVES, a minor, by his father and next friend, Fletcher Graves, Diane Harris, a minor, by her father and next friend, Robert Harris, Michael Jackson, a minor, by his father and next friend, Charlie Jackson, and all others similarly situated; Nevada Wade, on behalf of himself and all others similarly situated; Lillian Hill and Allie Bell Norris, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

WALTON COUNTY BOARD OF EDUCATION; Dr. Garfield Wilson, Individually and as Superintendent of Schools of Walton County, Georgia; Social Circle Board of Education; S. W. Causey, Individually, and as Superintendent of Schools of Social Circle, Georgia; J. L. Shepard, Chief of Police of Social Circle, Georgia, Individually, and as Chief of Police, and their agents, attorneys, successors, servants, employees, and all persons in active concert and participation with them, Defendants.

Civ. A. No. 681.

United States District Court
M. D. Georgia,
Athens Division.

May 14, 1968.

Memorandum Opinion and Decree
July 30, 1968.

Howard Moore, Jr., Peter Rindskopf, Atlanta, Ga., for plaintiffs.

William L. Preston, Monroe, Ga., Thomas S. Bentley, Atlanta, Ga., for defendants.

BOOTLE, Chief Judge:

The plaintiffs, suing for themselves and two classes, (1) Negro parents and pupils of the public schools of Walton County, Georgia who are similarly affected and injured by the action of the defendants in maintaining and operating a racially segregated school system, and (2) teachers in the public schools of said County similarly affected by alleged action of the defendants in penalizing and suspending them and threatening so to do because of attempts to petition the defendants about the conditions within their racially segregated school system, bring their complaint against Walton County Board of Education (County Board); Dr. Garfield Wilson, Superintendent of the Walton County Public Schools, suing him individually and in his official capacity; Social Circle Board of Education (Circle Board); S. W. Causey, individually and as Superintendent of Schools of Social Circle, Georgia; and J. L. Shepard, Chief of Police of Social Circle, Georgia, individually and as Chief of Police. The complaint against County Board, Wilson, Circle Board and Causey is that they are operating schools on a racially segregated basis. A further complaint against County Board and Wilson is that they have suspended three teachers. The complaint against Shepard, Chief of Police, is that he is threatening parents of children in attendance at the Social Circle Training School with the loss of welfare benefits and the burning of their homes if said parents continue to organize and speak out about conditions in their school and that he makes threats

to said parents due to their attempting to petition responsible Government officials for redress of their grievances.

The original complaint prayed for injunctive relief: (1) preventing the suspension or firing of teachers Hill and Norris; (2) preventing any interference with the rights of plaintiffs to speak freely, petitioning their Government, or seeking equal educational opportunities for their children, (3) preventing any interference with the right of minor plaintiffs to attend schools not racially segregated and which are equal with schools attended by the white race, and more particularly as a beginning in compliance and accordance with the decree set forth in United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966).

By an amendment the plaintiffs pray further that teachers Hill and Norris recover the balance due them since January 25, 1968 under their agreement to teach at the rate of $425.00 per month or $5100.00 for twelve months.

The defendants answered denying the material allegations of the complaint and the County Board and Wilson filed a counterclaim alleging in substance that the plaintiffs under the guise of demonstrating have combined and conspired to prevent the defendants from the peaceful and lawful operation of Walton County Schools, particularly the Social Circle Training School, and that in furtherance of the conspiracy they blocked the streets, thoroughfares, and roads leading to said school, placing themselves in the paths of school busses going to and from school disrupting the transportation of students to and from school, and that they initiated a boycott of said school by encouraging, counseling, aiding, persuading, and harassing Negro parents and students not to attend school and violate the compulsory school attendance laws of Georgia, to wit: Title 32, Georgia Code Annotated, §§ 2104 and 9914, thereby decreasing the average daily attendance down to 30%, when the normal average daily attendance was 90%, thus resulting in a substantial loss of state allotted funds, which funds are allotted on the basis of average daily attendance. The County Board and Wilson in said counterclaim pray for appropriate injunctive relief against plaintiffs.

The plaintiffs then answered said counterclaim and filed their motion to strike and dismiss the same.

Circle Board, Causey, and Shepard filed their motion for summary judgment based upon the evidence adduced at the evidentiary hearings held by this court on February 21 and 28, 1968 upon plaintiffs' prayers for a preliminary injunction.

The motion to dismiss the counterclaim is hereby overruled. It is preferable to dispose of the same upon the merits.

The motion for summary judgment is overruled as it is better to decide the case as to movants upon the merits, the evidence having already been heard.

At said hearings on February 21 and 28, 1968, while considerable evidence was heard with respect to the amount of progress being made or not made as to desegregation of the public schools in Walton County, the main focus seemed to be upon all types of alleged grievances at the Social Circle Training School, including the type of food served, the inadequacy of janitorial service, the use of students to work in the cafeteria, et cetera, and particularly upon the suspension of three teachers, one of whom was later fired, and upon the type, nature, and extent of demonstrations indulged in and sponsored by plaintiffs to evidence their discontent.

It does appear that the County Board adopted a plan of desegregation on August 18, 1965 and is operating under guidelines issued by HEW; that federal funds have not been cut off; that a recent letter from HEW indicates that there is probably noncompliance in some areas; that on February 1, 1968 HEW requested that "an adequate desegregation plan" be submitted within 30 days, and that there is now in operation a mandatory freedom of choice plan under

forms recommended by HEW. It appeared further that the County Board had requested of HEW an extension of the 30 day period above indicated because of the pendency of this case in this court.

Presently this court is not ruling upon the desegregation plan heretofore approved by HEW and apparently now questioned by HEW. Obviously, the matter should not be left in limbo, however, and either HEW or this court should act to whatever extent, if any, action is necessary. If either side thinks that further action in this regard by this court is necessary, either by way of approval or disapproval or modification of the desegregation plan which has been in operation for the past two years, they may apply to this court for a hearing in that regard.

The main grievance of the plaintiffs seems to relate to their dissatisfaction with the Negro principal of the Social Circle Training School, conditions in the cafeteria, as above referred to, and the suspension of teachers Hill and Norris, both Negroes, and teacher Nesbit, white. The complaint did not ask this court to require any of the defendants to discharge the principal nor do they ask any relief with respect to teacher Nesbit, but they do ask for injunctive relief against the suspension of teachers Hill and Norris. The demonstrations were aimed equally at causing the resignation of the principal and the suspension of teachers Hill and Norris. The facts as to the suspension are briefly as follows: On January 23, 1968 Wilson suspended the three teachers for non-performance of their duties in that the teachers were not in the classrooms with their pupils, and the teachers positively refused to return to their classrooms after Wilson had directly instructed them to do so. Their reason for leaving their classrooms and for disobeying Wilson's instructions that they return to their classrooms was that some of the parents were then visiting the school for the purpose of protesting school conditions to Mr. Wilson and that these parents desired these three teachers to remain present with them while they conferred with, and protested to, Wilson. On the same day Wilson wrote letters of suspension to all three teachers stating specifically the ground for removal as above indicated and that a formal hearing would be held before the County Board on February 13, 1968. This suit was filed on January 23, 1968 and no formal hearing has yet been held as to teachers Hill and Norris. On February 13, 1968, however, teacher Nesbit, the teacher not a party plaintiff and who had already tendered her resignation to become effective January 25, 1968, appeared before the Board for her formal hearing which was conducted resulting in the suspension being made final. No appeal was taken from that decision in view of her resignation.

Some guiding legal principles are applicable. A Court of the United States is loathe to interfere in the internal affairs of a state. The sovereignty of the states insofar as reserved to them by the Constitution of the United States is one of the keystones of our federal system. Another keystone of that system, of course, is the supremacy of the Constitution and valid federal laws enacted by Congress in pursuance thereof. Under the keystone first mentioned it is the duty of all persons, including those protesting against alleged grievances including alleged racial discrimination, to obey all valid state laws, properly administered, while asserting their protests. If they disobey them they run the risk of justified arrest and prosecution and punishment for their violations. Under the keystone second mentioned any state laws which are in conflict with the United States Constitution or a law enacted by Congress in pursuance thereof cannot be enforced nor can any valid state law be applied in a way to thwart the exercise of a right guaranteed by the Constitution and laws enacted by Congress in pursuance thereof. Accordingly, where it is alleged that certain state laws do so conflict or are being utilized not for legitimate state purposes, but as an expedient to deprive plaintiffs of valid federal rights a Court of the United

States must entertain the suit and if the allegations are proven and if injunctive relief appears to be required, it must issue the injunction. See N. A. A. C. P. v. Thompson, 357 F.2d 831, 833–838 (5th Cir. 1966).

■ Against these legal principles we measure the plaintiffs' case. The complaint, that is the pleading, alleges a case which, if proved, would entitle teachers Hill and Norris to relief. The allegation is, in substance, that they were suspended simply because they insist upon exercising free speech in regard to racial matters. Their case fails completely, however, in the matter of proof. The court finds that they were suspended not because they protested or desired to protest further, but because they left their classrooms during teaching hours and moreover firmly refused to return at the direct instruction of Superintendent Wilson. Schools cannot be conducted without someone being in charge. Teachers cannot be permitted to neglect teaching at will.

■ A further reason why these two teachers are not entitled to relief at this time is because they have not even requested the Board to give them their final and formal hearing originally scheduled for February 13, 1968. Before that time came they brought the matter to this court. Thus they have not been fired by the School Board. This is not to say that if federal rights were being flagrantly violated state administrative remedies must be exhausted before petitioning a United States Court. Here no federal rights of these teachers have been violated and under the particular facts of this case their appeal to this court is premature.

Also, the case made against Chief Shepard on paper falls down on proof. The court finds that Chief Shepard has made none of the threats alleged in the complaint. The evidence shows that Chief Shepard did undertake the collection of fi fas for unpaid city taxes, but he could hardly be expected to withhold this performance of legal duty on his part pending demonstrations.

This leaves only the counterclaim of defendants for injunctive relief against plaintiffs restraining them from violating state laws in reference to blocking traffic, failing to obey the lawful orders of traffic officers, GA.CODE ANN. 68–1602, and conspiring to violate Georgia's compulsory school attendance law, GA. CODE ANN. 32–2104, and interrupting or disturbing public schools, GA.CODE ANN. 26–6913.

■ However unlawful under state law the alleged conduct of plaintiffs may be (and the court finds that some of them did intentionally lie down in the street in front of school busses in order to interfere with the operation of the busses and that some of them did intentionally encourage children not to attend the public school), such conduct would not give the defendants in this case a cause of action in a United States Court for injunctive relief. This is so because such conduct, though a conspiracy, does not amount to a conspiracy purposefully to deprive others of equal protection of the laws and because there is no federal right in city or county officials to be protected in performance of their county or municipal duties and because there was no state action. The plaintiffs in this case, who would be defendants in such an action, are private persons and it is still the law that the Fourteenth Amendment and the statutes enacted pursuant to it, including 42 U.S. C.A. § 1985, apply only where there is state action. See Congress of Racial Equality v. Clemmons, 323 F.2d 54 (5th Cir. 1963). Whether or not these defendants might legally seek such injunctive relief by way of counterclaim when they could not do it by original complaint it is not necessary to decide (see Kelly v. Page, 335 F.2d 114, 118 (5th Cir. 1964)), because even granting arguendo that this court would have jurisdiction to grant such relief upon counterclaim the evidence shows and this court finds and concludes that no such relief is necessary. As stated in Collins v. Hardyman, 341 U.S. 651, at 662, 71 S.Ct. 937, at 942, 95 L.Ed. 1253, at 1260: " * * *

[Georgia] courts are open to * * * [defendants] and its laws offer redress for their injury and vindication for their rights." To quote from Congress of Racial Equality v. Clemmons, *supra,* at 55: "Moreover, this unusual federal action (the counterclaim) is in an area that is essentially one of State responsibility —the preservation of public order; and there is no lack or breach of peace statutes in * * * [Georgia]."

Accordingly, all injunctive relief prayed for is denied, leaving open for further hearing, if desired and requested, the matter of the desegregation plan for the public schools in Walton County, Georgia.

Counsel for defendants may prepare and submit an appropriate order in accordance herewith, submitting the same to counsel for plaintiffs for their comments as to form.

### MEMORANDUM OPINION

Desegregation of the schools in Walton County was only one of the objectives of the complaint in this case. Other objectives have been adjudicated by memorandum opinion dated May 13, 1968. That opinion left open for further evidentiary hearing the matter of desegregation of the schools. This further hearing was held on July 8, 1968. At this hearing, the defendants, recognizing that sufficient progress was not being made under the freedom of choice plans approved by the Department of Health, Education and Welfare under which plans less than 10% of the Negro pupils of the county were attending integrated schools, offered a plan of desegregation to take effect immediately and with the opening of schools on August 22, 1968. It appears that this revised plan had been submitted to the Department of Health, Education and Welfare as late as June 29, 1968 after said Department had rejected a plan submitted a few days earlier for the reason that it did not provide adequately for the desegregation of two of the schools in the county, the Social Circle Training School and the Social Circle Public School. The revised plan fully meets that objection in that it completely integrates these two schools with "rigid" attendance zones, providing one attendance zone, Zone 5, for the entire Social Circle area with all students, white and Negro, in grades 1 through 4 attending the Social Circle Training School and all students, white and Negro, in kindergarten and grades 5 through 12 attending Social Circle High School. The outstanding characteristic of this revised plan presented to the court by the defendants is that it voluntarily (insofar as the court is concerned, though perhaps influenced by the urgings of said Department) abandons the freedom of choice plan and adopts rigid attendance zones. Dr. Wilson, the County School Superintendent, testified: "We feel that the setting of definite attendance area(s) requiring students to attend school in that area, in a desegregated school, will accomplish the desegregation required."

The proposed plan divides the county into 5 attendance areas and then actually combines areas 1 and 3 in that there will be no schools in area 3 and all students in that area will be required to attend the schools in area 1, the Monroe complex. This abandonment of area 3 is traceable to the fact that the State Department of Education had required the consolidation of Good Hope Elementary, a white school, with one of the Monroe schools which would have left in area 3 only Good Hope-Peters, a Negro elementary school.

There is no evidence of any gerrymandering for racial or other improper reasons in the drawing of these area lines. All evidence indicates that they were drawn solely for legitimate educational reasons. Counsel for the County Board of Education assured the court: "I can state with truthfulness that these attendance zones were set up and established by the Board with absolutely no thought of race in mind." There is no evidence to the contrary and no reason to doubt the sincerity and accuracy of that assurance.

These newly established attendance zones are in fact a re-establishment or recognition of the same zones used several years ago before the use of freedom of choice with the exception that Zone 3, as above indicated, has been combined with Zone 1 and a new line has been established enlarging the Walker Park area, Zone 2, counsel for the County Board explaining this as follows: "At one time * * * the Walker Park attendance area came very close to the school, and just south of the school, and in order to make the attendance zone larger in Walker Park it was moved even nearer to Monroe at a point which we locally refer to as Breedlove's Dairy Farm, and it is a larger area than it was many years ago when we had these school attendance areas."

After hearing the evidence and arguments of counsel this court decided that the plan thus voluntarily proposed by the defendants should be adopted substantially as proposed and invited counsel for the defendants to prepare a proposed decree and file it with the court and inviting counsel for plaintiffs to prepare and file any objections or criticisms of the proposed decree. Such has been done and the decree which is being signed by the court today is substantially the decree as proposed by counsel for the defendants, changed a little here and there so as to meet some of the objections or criticisms of the plaintiffs.

The two major objections of the plaintiffs are overruled. They relate to the Walker Park attendance area and to Carver High School. The plaintiffs urge that the Walker Park attendance area, Zone 2, be consolidated with Zone 1, the Monroe complex, just as Zone 3 has already been consolidated with Zone 1. If this were done Zone 1 would then embrace more than one-half of the geography of the county. The defendants justify the establishment of Zone 2, the Walker Park area, on the grounds, among others, that this is a fast growing and developing area, and will continue to need a school located therein. Of course, attendance zones, just as freedom of choice, is not an end in itself and if it should develop in the long run that attendance zone lines should be redrawn for any valid reason the courts will still be open. The complaint with respect to Carver High School is that it should be completely desegregated, kindergarten through grade 12, instanter, and that the plan with respect to this school proceeds too slowly. The plan with respect to this school is that kindergarten and grades 1, 2, 3, 4, 5, 6 and 7 be completely desegregated instanter, but that grades 8 through 12 remain as a predominantly Negro High School for only one year, 1968–69. Then under the plan beginning with the school year 1969–70 Carver will become a Junior High School only and house only 7th and 8th grade students, white and Negro, in the Monroe attendance area, Zone 1. For the upcoming year, beginning August 22, 1968, all of the Carver grades below 8 will be incorporated into the completely desegregated schools in the Monroe area, Zone 1. Considering the plan in its overall aspects and in view of the element of time —the nearness of school opening—this proposed handling of Carver is acceptable. As Dr. Wilson, the County School Superintendent, testified: "High School is quite different from an elementary school administratively. High School scheduling, student scheduling must be done in advance. Students make their schedules out and their programs of study out in advance. Extra-curricular activities are scheduled in advance. Football schedules are scheduled two years ahead of time. It is harder to abandon a high school than it is an elementary school."

At the hearing on July 8, 1968, the defendants' proposal was that Carver be continued as a predominantly Negro High School for one year only for grades only 9 through 12 with a projected number of students of 279. The proposed decree later submitted increases the grades of this school for the one year by adding thereto grade 8. Noticing this change, the Court arranged a conference telephone call with counsel for the plaintiffs,

the County Board, and Dr. Wilson during which it was explained by counsel for the County Board and Dr. Wilson that this change was made by the Board subsequent to the hearing upon the recommendation of the Principal of Carver High School, who based his recommendation upon the fact that State authorities might rate Carver High a substandard school if it had as low as 279 students, whereas they would in all probability rate it as a standard school if it had as many as 412 students, which number it probably will have if the 8th grade is included. It was further explained by said counsel that this proposed change had been explained by the County Board by telephone to the Department of Health, Education and Welfare, and that subsequent to such explanation said Department had written to Dr. Wilson a letter dated July 22, 1968, fully approving said plan of June 29, 1968, as modified by letting the 8th grade remain as a part of Carver High for the one year, 1968–69. A copy of said letter was mailed under date of July 26, 1968, to counsel for plaintiffs and to the court, and is hereby made a part of the record in this case.

### DECREE

It is ordered, adjudged, and decreed that Walton County Board of Education (hereinafter named the County Board), Dr. Garfield W. Wilson (hereinafter named the County Superintendent), Social Circle Board of Education (hereinafter named the City Board), and S. W. Causey (hereinafter named the City Superintendent), their agents, officers, employees and successors and all those in active concert and participation with them be and they are permanently enjoined from discriminating on the basis of race or color in the operation of the county schools and the city schools. As set out more particularly in the body of the decree, they shall take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system in both the county system and the city system. The primary concern is that attendance-zone lines be drawn on a nonracial basis, and to this end the County Board and the City Board will conduct surveys and make required reports to the Court as more specifically described later in this decree, since there has already been in operation a freedom of choice plan which has not yet eliminated the dual school systems under their control.

### I.

### STUDENT ASSIGNMENT

■ A. The County Board and the City Board shall, to the extent feasible, make assignments of students according to attendance area lines in such a way as to eliminate the effects of past racial decisions in assigning students, drawing attendance lines and constructing and using school buildings. Attendance lines for the systems are shown by a map with school locations hereunto annexed, marked Exhibit "A", made a part of this decree, and assignments of students shall be made according thereto, beginning with the 1968–69 school year which begins August 22, 1968.

■ B. The County Board and the City Board shall arrange for the conspicuous publication of an announcement, giving information as to the name and location of schools to which students have been assigned for the coming school year pursuant to the desegregation plan, in the newspapers most generally circulated in the community, and if radio and television publicity is available, then this media shall also be used. This shall be done now, and also between March 1 and March 31 of each year. Publication as a legal notice is not sufficient. Whenever any revision of attendance zones is proposed, the County Board and the City Board shall arrange, as applicable, for the conspicuous publication of an announcement at least 30 days before any change is to become effective, naming each to be affected and describing the proposed new zones. Copies of all material published hereunder must also be given at that time to all news media

available and serving the community. Copies of this notice and decree shall be posted in each school in both systems and at the office of the County Superintendent and the City Superintendent.

C. A street or road map showing the boundaries of and the school serving each attendance zone and a chart showing school bus routes must be freely available for public inspection at the office of the superintendents. Each school in the system must have freely available for public inspection a map showing the boundaries of attendance areas, together with school bus routes. A copy of all of this information shall be given to the Parent Teachers Association at each school.

D. Pursuant to the attendance areas drawn to achieve the desegregation of the system, as provided in this decree, all students will be required to attend the school serving their zone, absent some compelling nonracial reason.

## II.

### CONSTRUCTION

To the extent consistent with the proper operation of the county system and the city system as a whole, the County Board and the City Board will, in locating and designing new schools, in expanding existing facilities, and in consolidating schools, do so with the objective of eradicating past discrimination and of effecting desegregation. The school boards will not fail to consolidate schools because desegregation would result.

## III.

### FACULTY AND STAFF ASSIGNMENTS

A. *Faculty Employment.* Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or cor-

recting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race, (white or Negro), shall be on the desegregated faculty. The County Board and the City Board will continue positive and affirmative steps to accomplish the desegregation of its school faculties and to achieve substantial desegregation of faculties in its schools for the 1968–69 school year notwithstanding teacher contracts for 1968–69 may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The County Board and the City Board shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in school.

B. *Dismissals.* Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within 5 days after such dismissal, demotion, etc., as proposed.

■ C. *Past Assignments.* The County Board and the City Board shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.

## IV.

## REPORTS

■ A. On June 10 of each year, beginning in 1969, defendants will submit a report to the Court and serve copies on opposing counsel, showing the number of teachers by schools, grade (where appropriate), and race they anticipate will be employed for the fall quarter or semester. Within one week after the day classes begin for the fall quarter or semester in 1968 and each succeeding year defendants will submit a report to the Court and serve a copy on opposing counsel, showing the number of teachers actually working at each school by grade (where appropriate) and race.

■ B. On the same dates set forth in A. above, reports will be submitted to the Court, and a copy served on opposing counsel, showing the number of students by school, grade, and race expected (in June report) and actually enrolled (in fall report) at the schools in Walton County.

■ C. Within one week after the opening of each school year, defendants shall submit a report to the Court and serve copies on opposing counsel, showing the number of faculty vacancies, by school, that have occurred or been filled by defendants since the order of this Court or the latest report submitted pursuant to this sub-paragraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

## V.

## SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS

■ No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics or other extracurricular activity) that may be conducted or sponsored by the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to long standing, nonracially based rules of city, county or state athletic associations dealing with the eligibility of transferred students for athletic contests. All school use or school-sponsored use of athletic fields, meeting rooms and all other school related services, facilities, activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the County Board and the City Board shall be conducted without regard to race or color. Athletic meets and competitions and other activities in which several schools participate shall be arranged so that formerly white and formerly Negro schools participate together.

## VI.

## SCHOOL EQUALIZATION

■ A. *Inferior Schools.* In schools heretofore maintained for Negro students, the defendants shall take prompt steps necessary to provide physical facilities, equipment, courses of instruction, and instructional materials of quality equal to that provided in schools

previously maintained for white students. Conditions of overcrowding, as determined by pupil-teacher ratios and pupil-classroom ratios shall, to the extent feasible, be distributed evenly between schools formerly maintained for Negro students and those formerly maintained for white students. If for any reason it is not feasible to improve sufficiently any school formerly maintained for Negro students, where such improvement would otherwise be required by this paragraph, such school shall be closed as soon as possible, and students enrolled in the school shall be reassigned on the basis of attendance zones.

B. *Remedial Programs.* The defendants shall provide remedial education programs which permit students attending or who have previously attended segregated schools to overcome past inadequacies in their education.

## VII.

## SPECIAL PROVISIONS

A. The County of Walton, including the area of Social Circle has been divided by the County Board and the City Board by attendance zone lines, as shown by Exhibit "A". These zones or areas are numbered 1 through 5.

B. Beginning with the 1968–69 school year there shall be four schools serving zones 1 and 3. They are: Monroe Primary, Monroe Elementary, Monroe Area High School and Carver High School. Monroe Primary will house grades 1 through 3; Johnston Institute (a part of Monroe Primary School) will house kindergarten; Monroe Elementary will house grades 4 through 7; Monroe Area High School will house grades 8 through 12; and Carver High School will house grades 8 through 12. There are no schools to be used in zone 3 and all students residing in zone 3 will attend the schools in zone 1. Students in zones 1 and 3, grades 8 through 12, will either attend Monroe Area High School or Carver High School, depending upon which school they attended in the 1967–68 school year under the freedom of choice plan. Provided, however, said students shall for said year still have the same freedom of choice rights they had under the freedom of choice plan heretofore in use.

In addition to grades 8 through 12, Carver High School will house 2 upper-elementary educable mentally retarded classes, 1 high school art program, 1 industrial art program and 1 music program which will not be offered in Monroe Area High School. School transportation will be furnished to Monroe Area High School students who elect to take art, industrial art, and music courses which are offered only at Carver High School.

1. However, beginning with the 1969–70 school year, Carver High School will be converted to a junior high school and house all seventh and eighth grade students in zones 1 and 3. Beginning with the 1969–70 school year students formerly attending Carver High School will be assigned to Monroe Area High School. At that time, Monroe Area High School will then house grades 9 through 12.

C. Beginning with the 1968–69 school year Walker Park will house grades kindergarten through 8 for all of zone 2. Students in zone 2, grades 9 through 12, will either attend Monroe Area High School or Carver High School, depending upon which school they attended in the 1967–68 school year under the freedom of choice plan. Provided, however, said students shall for said year still have the same freedom of choice rights they had under the freedom of choice plan heretofore in use. However, beginning with the 1969–70 school year, all students, grades 9 through 12, in zone 2 will attend Monroe Area High School.

D. Beginning with the 1968–69 school year all students residing in zone 4, grades kindergarten through 2, will be housed in the West Walton School. All students in zone 4, grades 3 through 12, will be housed in the Loganville School.

E. Beginning with the 1968–69 school year all students residing in zone 5,

grades 1 through 4, will be housed at Social Circle Training School. In zone 5, kindergarten and grades 5 through 12 will be housed in Social Circle Public School. The County Board and the City Board have made an agreement which includes financing arrangements for Social Circle Training School and Social Circle Public School to be operated by the City Board. This was necessary by reason of the fact that the City Board is under Georgia law a separate and independent system from the County Board.

F. The County Board offices will be moved from the present courthouse annex into the Carver Elementary building during the year 1968–69.

## VIII.

### JURISDICTION

The Court retains jurisdiction for the purpose of implementation of this decree.

So ordered.