Anson GRAVES, et al., Plaintiffs,

v.

WALTON COUNTY BOARD OF EDU-
CATION, Social Circle Board of
Education, et al., Defendants,

v.

Veda J. BAKER, et al., Intervenors.

Civ. A. No. 681.

United States District Court,
M. D. Georgia,
Athens Division.

July 27, 1981.

Napoleon G. Williams, New York City, Roger Mills, Atlanta, Ga., Sidney L. Nation, Conyers, Ga., William L. Preston, Monroe, Ga., for plaintiffs.

Thomas Bentley, Atlanta, Ga., W. Warren Plowden, Jr., Macon, Ga., for defendants.

ORDER DISPOSING OF ALL[1]
PENDING MOTIONS

OWENS, Chief Judge.

On March 13, 1981, the United States Court of Appeals in an unpublished opinion remanded this case to this court with the following instructions:

"This Court does hereby sua sponte remand this case to the District Court with instructions to rule on all pending motions by way of written opinion with appropriate findings of fact and conclusions of law. In particular, the District Court is ordered to separately consider the intervenor's Motion to Dismiss for Mootness and the plaintiff's Motion to Add Plaintiffs or, in the alternative, a Motion

---

1. By letter dated March 31, 1981, counsel for Veda J. Baker, et al., Intervenors, withdrew all pending motions *except* the following: (1) Motion to Vacate and Dismiss 1968 Desegregation Order for Mootness; (2) Motion to Modify 1968 Desegregation Order; (3) Motion for *Youngblood* Hearing. Plaintiffs' and Defendants' motions will be enumerated as they are each decided.

to Allow Intervention as Plaintiffs. The District Court is ordered to make detailed and specific findings of fact and conclusions of law with respect to those last mentioned motions. Finally, the District Court is ordered to inform this Court if and when the present case was properly certified as a class action.

"This Court will retain jurisdiction over the case during its pendance in the District Court. Any party to this action may make such motion with this Court or take such appeal as may be appropriate, within thirty days after the District Court finishes ruling on those matters before it as a result of our decision today.

"This case is remanded to the District Court with instructions.

REMANDED."

Upon receipt of the said March 13th order the court, by letter of March 16th, requested the parties to submit proposed findings of fact and conclusions of law as to all pending motions within ten days. Counsel suggested that sixty or more days were needed to supplement the record and submit proposed findings and conclusions. The court approved the requested greater time and asked counsel to advise the court when they believed the pending motions were ready for decision. Counsel having advised that the record is complete and all motions are ripe for decision, this constitutes the court's findings of fact and conclusions of law disposing of all pending motions.

## FINDINGS OF FACT

Under the Constitution of this State and the laws enacted by the legislature of this State there are two public school systems serving the school children of Walton County, Georgia—(1) the Social Circle Board of Education [2] is statutorily responsible for the education of all children who reside within the city limits of Social Circle and (2) the Walton County Board of Education [3] is constitutionally responsible for the public education of all Walton County children who reside outside the city limits of Social Circle.

In 1953 these two school boards, pursuant to Article 8, Section 9, Paragraph 1 of the Georgia Constitution of 1945 (Code Ann. 2–7201)—which provides that county boards of education and independent school systems may contract with each other for the education, transportation and care of their pupils—"entered into a twenty-five year contract for the education of certain students.[4] It provided generally that the city board would enroll white students from a designated area of Walton County, and the county board would enroll black students from Social Circle. Provisions were made in the contract for transportation and payment of the cost of education of these students ..." *Walton County Board of Education v. Academy of Social Circle,*[5] 229 Ga. 114, 189 S.E.2d 690 (1972).

From 1953 until several years before this lawsuit commenced on February 8, 1968, the children of Walton County were educated jointly by the Walton County Board of Education and the Social Circle Board of Education in the contractually agreed upon manner. Upon demand of the Department of Health, Education and Welfare the two boards of education agreed to modify their contractual arrangement to permit all students an annual freedom of choice as to any school within both school systems. Otherwise, the contract remained unchanged.

The subject complaint was filed on February 8, 1968. The plaintiffs are described in the heading and within the complaint as follows:

---

2. 1905 Ga.Laws, p. 515 created the Academy of Social Circle which is now known as the Social Circle Board of Education. It is an independent school system of this State.

3. See 1956 Ga.Laws, Vol. 1, pp. 433, 440.

4. Copy is attached as Appendix I.

5. The Supreme Court of Georgia considered the county board's due process and legal contentions and found the contract to be valid.

"ANSON GRAVES, a minor by his father and next friend, FLETCHER GRAVES, DIANE HARRIS, a minor, by her father and next friend, ROBERT HARRIS, MITCHAEL JACKSON, a minor, by his father and next friend, CHARLIE JACKSON, and all others similarly situated; NEVADA WADE, on behalf of himself and all others similarly situated; LILLIAN HILL and ALLIE BELL NORRIS, on behalf of themselves and all others similarly situated,

        Plaintiffs,

        vs.

WALTON COUNTY BOARD OF EDUCATION; DR. GARFIELD WILSON, Individually and as Superintendent of Schools of Walton County, Georgia; SOCIAL CIRCLE BOARD OF EDUCATION; S. W. CAUSEY, Individually, and as Superintendent of Schools of Social Circle, Georgia; J. P. SHEPARD, Chief of Police of Social Circle, Georgia, Individually, and as Chief of Police, and their agents, attorneys, successors, servants, employees, and all persons in active concert and participation with them,

        Defendants.

: CIVIL ACTION
: NO. 681

## "COMPLAINT

### I. PARTIES

"A. *PLAINTIFFS.*

Plaintiffs ANSON GRAVES, DIANE HARRIS, and MITCHAEL JACKSON are all minor Negro citizens of the United States and of the State of Georgia, residing in Walton County, Georgia, and specifically, the Social Circle Training School in the City of Social Circle, Georgia. ANSON GRAVES attends the third grade; DIANE HARRIS attends the eighth grade, and MITCHAEL JACKSON attends the third grade. They sue on behalf of themselves and all other NEGRO school children of Walton County, Georgia, similarly situated, and who suffer common injuries, which class is too large to bring before this Court.

2. NEVADA WADE is a Negro adult citizen of the United States and of the State of Georgia, residing in Walton County, Georgia. He has two children, Michael Wade and Melvin Wade, who attend the third and first grades of the Walton County Public Schools, respec-

tively. He sues on behalf of himself and all other Negro parents of Walton County, Georgia, similarly situated, and who suffer common injuries, which class is too large to bring before this Court;

3. LILLIAM (sic) HILL and ALLIE BELL NORRIS are Negro adult citizens of the United States and the State of Georgia, residing in Walton County, Georgia. They are under contract to teach at the Walton County Public Schools, specifically at the Social Circle Training School. Lillian Hill has a sixth-grade homeroom and teaches social studies to grades five through eight. Allie Bell Norris teaches second grade. Both Lillian Hill and Allie Bell Norris are currently suspended from their teaching duties. They sue on behalf of themselves and all other Walton County teachers, similarly situated, and who suffer common injuries, which class is too large to bring before this court."

The complaint in Paragraph 11 alleged that:

"11. This is a class action under Rule 23, Federal Rules of Civil Procedure, involving two classes, all members of each of which have been and continue to be similarly injured by the defendants. Class (1) is made up of the Negro parents and pupils of the public schools of Walton County, Georgia, who are all similarly affected and injured by the action of the defendants in maintaining and operating a racially segregated school system. They adequately represent the interests of the class and involve common questions of law and fact. Class (2) is made up of teachers in the public schools of Walton County, Georgia, who are all similarly affected by the action of the defendants in penalizing and suspending them from their position, and threatening to do the same, because of attempts to petition the defendanta (sic) about the conditions within their racially segregated school system. They adequately represent the interests of the class involve (sic) common questions of law and fact."

The plaintiffs prayed for a temporary restraining order, a hearing and preliminary and permanent injunctive relief (a) to prevent the further suspension or firing of the named plaintiff teachers and the members of the class (b) to cause the defendants Walton County Board of Education and Social Circle Board of Education to cease "5. Preventing or interfering with the right of minor plaintiffs and the class that they represent from attending schools which are not racially segregated and which are not educationally equal with those schools attended by pupils of the white race, in every aspect, and more particularly, as a beginning, in compliance and accordance with the decree laid down by the United States Court of Appeals for the Fifth Circuit in the case of *United States v. Jefferson County Board of Education*,[6] 372 F.2d 836 (1966). . . ."

In the responsive pleadings filed, defendant Social Circle School Board, for want of knowledge or information, neither admitted nor denied the allegations in Paragraph 11 that this case should proceed as a class action and defendant Walton County Board of Education stated that Paragraph 11 requires no answer since it states conclusions of law.

On February 21, 1968, pursuant to a show cause order the court held a hearing on plaintiffs' prayer for a temporary restraining order. Judge W. A. Bootle presided. At the outset plaintiffs asked that the hearing be conducted for the purpose of considering preliminary injunctive relief for the plaintiff teachers and the issuance of a temporary restraining order for the plaintiff Negro parents and pupils. The defendants agreed that the hearing could be on preliminary injunctive relief. Evidence was then heard on that date and on February 28, 1968.

Most of the evidence concerned the plaintiff teachers; since they are not involved in the matters now before the court it is unnecessary to summarize it.

The evidence concerning the operation of the public schools showed that defendant Walton County Board of Education under its contractual arrangement as modified by freedom of choice, was then operating nine public schools serving 5,408 students of whom 3,200 were white and 2,208 were Negro. Of the 2,208 Negro students some 75 Negro high school students and 150 to 175 Negro elementary students—a total of 225 to 250 of some 2,208—were then enrolled in formerly all-white schools. The system employed 215 teachers some 60 to 70 of whom were Negro. No Negro teacher was then teaching full-time in a formerly all-white school; four white teachers were teaching in Negro schools. Of the county board's three high schools one—Carver—was all-black and the other two had almost all-white student bodies. Monroe Area High School had 15 to 20 and Loganville High School had 30 to 40 Negro students. All-black Carver and predominantly white Loganville schools included grades one through twelve. Of the elementary schools two were all-white, two were predominantly white, and two were all-Negro. Of the all-Negro elementary schools one—Social Circle Training School—was located in the City of Social Circle and by the said 1953 contract was for the education of all black children who resided in Social Circle; absent that contract those Negro city students would have been attending defendant Social Circle Board's schools.

Defendant Social Circle Board of Education was operating one school, Social Circle Public School, which included grades kindergarten through twelve and had some 650 students. Of the 650 students some 65 were black. Negro students were first enrolled in September, 1966. The system employed 27 white teachers and no black teachers.

During these two hearings neither the plaintiffs nor the defendants even mentioned the question of whether or not this action should proceed as a class action.

---

**6.** In *Jefferson* the Fifth Circuit Court of Appeals, among other things, stated ". . . If Brown I left any doubt as to the affirmative duty of states to furnish a fully integrated education to Negroes as a class, Brown II resolved that doubt. . . ." 372 F.2d at 846.

On May 14, 1968, Judge Bootle entered an order, 300 F.Supp. 188, which began:

"BOOTLE, District Judge:

The plaintiffs, *suing for themselves and two classes*, (1) *Negro parents and pupils* of the public schools of Walton County, Georgia *who are similarly affected and injured* by the action of the defendants in maintaining and operating a racially segregated school system, and (2) *teachers* in the public schools of said County *similarly affected* by alleged action of the defendants in penalizing and suspending them and threatening so to do because of attempts to petition the defendants about the conditions within their racially segregated school system, bring their complaint against Walton County Board of Education (County Board); Dr. Garfield Wilson, Superintendent of the Walton County Public Schools, suing him individually and in his official capacity; Social Circle Board of Education (Circle Board); S. W. Causey, individually and as Superintendent of Schools of Social Circle, Georgia; and J. L. Shepard, Chief of Police of Social Circle, Georgia, individually and as Chief of Police." (emphasis added).

After summarizing the contentions of the parties Judge Bootle denied the plaintiff teachers the injunctive relief they prayed for, stating the court was "not ruling upon the desegregation plan heretofore approved by HEW and apparently now questioned by HEW . . . ." He invited either side to apply for a hearing when further court action was deemed necessary.

Plaintiffs appealed and by virtue thereof the printed appendix of all that transpired through May 14, 1968, can be found in Appeal No. 26,452.

On May 24, 1968, Judge Bootle had a pre-trial hearing to inquire into what, if anything, the court is being requested to do and what the court ought to do with respect to desegregation of the public schools in Walton County. Asked to report on the status of matters between HEW and the county board, counsel for the county board reported:

"MR. PRESTON:

If Your Honor please, the Walton County Board of Education at the present moment is in *dire straits with HEW*. The Walton County Board of Education was notified on April 23, 1968 that the present plan for desegregation needed further implementation. *They face an immediate cut off of some $330,000 of federal funds.*

On May 14, 1968, a few short days ago the Board of Education directed Dr. Wilson to come up with a plan, to prepare and submit a plan to them which would eliminate the cut-off of funds.

At a meeting yesterday, at which I was not in attendance, because I was on a trial, which was the 23rd day of May, this plan was submitted to the Walton County Board of Education. I went by to see Dr. Wilson and had a conference with him this morning, prior to coming to Macon for this hearing. I asked Dr. Wilson to submit to me a copy of his proposal which is in the breast of the board now, and I have brought that with me.

I can not speak for and on behalf of the Board, but I will go so far as to say that if the Board does not adopt it the federal funds will be cut off. Dr. Wilson told me he had made this recommendation to the Board, he was insisting that the Board adopt this further plan for the elimination of the dual system, and that in his professional opinion if the plan were adopted immediately by the Walton County Board that it would meet any and all HEW requirements.

As I say, I can not speak for the Board but I would be glad to give Your Honor and Mr. Moore the pertinent parts of this new and more fully implemented desegregation plan as required by HEW for the record now." (emphasis added).

Asked for plaintiffs' views counsel responded:

"[5] MR. MOORE:

Your Honor, it would be my view that the best of all possible worlds would be for the court to enter, as a beginning, a Jefferson decree in the Walton County

School System, and the effect of entering a Jefferson County decree would be this: (1) *It would certainly get Walton County off the hook with HEW* because the Court entered decree then becomes the plan that HEW has to accept under the law and under the guidelines, which means there would be no cutoff for HEW. It further benefits Dr. Wilson to this extent: that once the Court has entered the Jefferson-type decree he could then come forward with his plan and request modifications of the Jefferson decree so as to allow certain aspects of his plan to work, which would be peculiar to that county. It would benefit the plaintiff and all of the citizens of Walton County because if the Court entered a decree the decree is enforceable without the threat of a cut-off of funds, which is, in a sense, the most vital aspect of operating the school system. I believe the testimony at the trial was that the annual budget is some million and two hundred thousand dollars, maybe a little more or less, and the *money that they get from HEW is roughly one-fourth of the total annual budget.*" (emphasis added).

\*     \*     \*     \*     \*     \*

After further comments of plaintiffs' counsel, the county board's counsel responded:

"MR. PRESTON:

Well, Your Honor, I think HEW has the Board at the chopping block and I don't think as the present board is constituted that the Walton County Board wants to lose any federal funds. That's about all I have to say about it.

THE COURT:

All right. Would I be of help to them in giving you a Jefferson type decree so that they couldn't lose the funds, but in doing that I don't mean to hold out any hope of refuge because they are going to have to desegregate, whether they do it in court or in Washington.

MR. PRESTON:

Yes sir, yes sir.

THE COURT:

*They are going to have to desegregate.*

MR. PRESTON:

*I certainly concur in that* and that is why Dr. Wilson is anxious to make implementation of that skeletal plan which you have there at the bench." (emphasis added).

\*     \*     \*     \*     \*     \*

The Social Circle Board initially took the position that it has no differences with HEW and was not therefore part of the problem being discussed. Upon inquiry of the court the city board acknowledged that since its funds are channelled through the county board, a cutoff of funds would affect the city board.

After further discussion concerning nothing other than what form of injunctive order should be entered, the hearing concluded with the following colloquy:

"THE COURT:

Well, I think you all ought to confer, because as I say, now, if you want a Jefferson decree I'm too busy, I'm not going to sit down here and dictate a half a day on a Jefferson decree. You gentlemen are going to have to prepare it, you see. I'm not going to do that. It's not necessary and I can't do it as well as you can anyhow, and you don't have much option. Judge Wisdom wrote it for us, you see. It's just simply adapting it.

MR. PRESTON:

To local means and local conditions.

THE COURT:

And not too much adaptation, except you'll change a date on it to the present date, rather than the one that Judge Wisdom had on it a year and a half ago, and I think you could recognize your choice period for this year as what it actually was, you see, and then prescribe a uniform choice period for future years. I suggested the one alteration that would do you good, both sides. You can copy it from the Bibb County decree that the Clerk would let you see back there, and then you are going to get to this problem about—well, that's the main thing. And, for instance, you know it has provisions in there about your building plans for the

future. If you are going to build a new school you can't purposely build it so as to perpetuate—well, you are familiar with that.

So, I am just going to forget about it until I hear from you gentlemen, and I am available whenever you need me."

On July 8, 1968, Judge Bootle presided over an evidentiary hearing on the question of desegregation relief. At the outset county board counsel stated:

"MR. PRESTON:

May it please the Court, there is on file with the Court what I will refer to as the further plan of desegregation, together with a map of the proposed attendance areas adopted by the Walton County Board of Education. That is on file with your Honor. I mailed it to Your Honor.

THE COURT:

Yes sir.

MR. PRESTON:

Now that is the identical plan which was submitted by Walton County Board of Education to HEW. Since the last court hearing Dr. Wilson, Superintendent of the Walton County Schools, has been notified by HEW that this plan is not acceptable to HEW.

As I understand it, the main reason it was not accepted by HEW was that no adequate provision had been made in the plan to desegregate the Social Circle Training School. Is that substantially correct, Dr. Wilson?

DR. WILSON:

That's right.

MR. PRESTON:

The Walton County Board of Education, after being notified by HEW that this plan, as submitted, was not acceptable, and subsequent to the time that I filed the map and the plan with Your Honor, met again and on June 29, 1968, adopted an additional modified plan of desegregation which I will refer to as the June 29th plan.

In this plan there is a provision which was later *ratified by the Social Circle Board and the Walton County Board.* Steps were taken to operate Social Circle

Training School by contract between the Social Circle Board and the County Board. The plans for that, Your Honor, I would like for Dr. Wilson and Mr. Causey to testify to, but in substance it provides that Grades 1 thru 4 in the Social Circle attendance area will attend the Social Circle Training School, without regard to race. K—kindergarten—and Grades 5 thru 12 will attend the old Social Circle Public School, and *an attendance area based on the map which I submitted to Your Honor has been designed and agreed upon.* The operation of these two schools will be based upon *adoption by both Boards of a financial and contractual arrangement* concerning that, which we think, Your Honor, will eliminate HEW's objection to our failure to take affirmative steps to desegregate the Social Circle Training School.

This June 29th plan has been submitted to HEW. We have not, of course, heard from HEW as to this June 29th plan. We are prepared to present to the Court, if the Court so desires, the testimony of Dr. Wilson showing the June 29th plan in detail, which can also be supplemented by the testimony of Mr. Causey. And that is the present status of the action of the two Boards since we last had a court hearing." (emphasis added).

After hearing further from all counsel the court stated:

"THE COURT:

All right, I'm ready to hear then any evidence that either side wants to offer and any proposals. I like to get all the light I can. And you may approach it, I take it, that under the decision in the Jefferson case *these plaintiffs are entitled to a court decree* if they want one. Just what it ought to contain, I don't know. I'd like to hear the evidence on it and see what the Board is ready to come up with. But under the Jefferson type decree, or under the decision in that case —there's never been a court decree in this case on integration, has there?

MR. RINDSKOPF:

No sir.

THE COURT:

And I take it that the *plaintiffs are entitled to a court decree if they want one, and as a minimum they are entitled to a Jefferson type decree,* and evidently it ought to be adjusted to some extent to suit the present situation. *Am I right there, Mr. Preston?*

MR. PRESTON:

Yes sir." (emphasis added).

The evidence then heard showed that a standing committee consisting of members of both the city and county boards had met over a period of time and recommended to both boards that a five zone attendance area plan be agreed upon; that Walton County educate all children within Zones 1, 2, 3, and 4; and that Social Circle educate all children in Zone 5. Zone 5 includes all of Social Circle and a portion of Walton County adjacent to but outside the limits of Social Circle. The court was advised that all financial arrangements had been worked out between the two boards, and that the two boards had agreed to the plan.

The court suggested that since the defendant school boards prepared a proposed plan, the defendant school boards should prepare a proposed decree.

On July 17, 1968, the defendant school boards prepared and filed a proposed decree; on July 22nd plaintiffs filed their objections.

Through and including all papers filed and all that was said by all counsel there was never a suggestion by anyone that the question of whether or not the plaintiff class should be certified was an issue to be decided. Defendants from the outset considered that plaintiffs were entitled to injunctive relief and for their own benefit urged the court to issue its decree.

On July 30, 1968, Judge Bootle filed his memorandum opinion and for reasons therein stated adopted the proposed, agreed upon by both the city and county board, decree as the injunctive order of the court. 300 F.Supp. 188, 195.

The decree as prepared by the defendant school boards and adopted by the court provides relief not for the individual plaintiffs but for the entire plaintiff class of Negro parents and students.

Plaintiffs appealed the part of the decree delaying integration of all-black Carver for one year, and as a result the Fifth Circuit ordered the plan revised to provide for integration of Carver at the beginning of the second semester of the 1968–69 school year. 403 F.2d 184 (5th Cir. 1968). As thus revised, the court's order was in full force and effect. The defendant school boards effected the court's order and began filing reports with the court.

After three school years—68–69; 69–70; 70–71—of operating all of the county and city schools under the court's order the defendant county board moved the court on September 7, 1971, to modify its July 30, 1968, order to permit the county board to take over the education of all Zone 5 children residing outside the city limits of Social Circle. A promptly held evidentiary hearing revealed that the two school boards had agreed to disagree over the manner in which state capital outlay funds should be divided between the two systems and that this was the reason for the motion. The county board in effect suggested that the agreed upon plan be scrapped and the parties revert to the pre-1953 contract arrangement by which the county board would educate all county children and the city board would educate all city children. The evidence indicated that the withdrawal of Zone 5 county children from the city board would not leave the city with enough children to make it economically feasible to operate as a separate system.

A State Department of Education witness testified that the State of Georgia will honor an agreement as to the division of capital outlay funds between these two school years if the agreement is for a term of 25 or more years.

By order dated December 17, 1971, Judge Bootle refused to modify the 1968 decree saying that, "Of great importance are the facts that (1) excellent educational opportunities *are being provided for all children* both in the City schools and in the County

schools, and (2) under the consent decree *desegregation has been fully accomplished,* at least to the extent that no one is complaining with respect thereto." (Emphasis added). A copy of that order is attached as Appendix II.

From December 17, 1971, until January 11, 1979, the court received nothing other than required reports from any party. No one submitted a motion or request to hold a Youngblood hearing. 448 F.2d 770 (5 Cir.). No motion or request for such a hearing having been received, none was held.

On March 6, 1973, the defendant city board and county board entered into a written twenty-five year contract. This contract was not filed with the court. It apparently was adopted because of the State's twenty-five year requirement and this court's refusal to modify. It provides:

"GEORGIA, SOCIAL CIRCLE

THIS CONTRACT made and entered into this 6th day of March, 1973, between the Walton County Board of Education of Monroe, Walton County, Georgia, and Social Circle Board of Education of Social Circle, Georgia.

WITNESSETH that the parties hereto in consideration of agreements made by each other hereby agree as follows:

(1) Walton County Board of Education agrees to allow approximately 417 students living in the Walton County area to attend schools operated by the Social Circle Board of Education.

(2) Social Circle Board of Education will be allowed to report the ADA and receive State Funds for students residing in Walton County, Georgia, attending schools operated by the Social Circle Board of Education.

(3) Social Circle City Board of Education agrees to take the building formerly known as the Social Circle Training School building which has an average capacity of 400 students.

(4) This contract shall become effective beginning with the 1973 school year and shall continue in effect for each school year for a period of 25 years.

WALTON COUNTY BOARD OF EDUCATION

ATTEST: /s/ _____    BY: /s/ _____
       Secretary                Chairman

SOCIAL CIRCLE BOARD OF EDUCATION

ATTEST: /s/ _____    BY: /s/ _____
       Secretary                Chairman"

On January 11, 1979, a motion to intervene was filed by the Monroe Chapter of the Southern Christian Leadership Conference and certain individual black students and parents, and after responses were considered was denied.

On November 6, 1979, the defendant Social Circle Board of Education then moved the court to enforce the court's 1968 consent decree by causing some 100 Zone 5 students now attending county board schools to return to city schools where the court's consent decree requires them to be.

The November 21, 1979, response of the county board showed that 100 Zone 5 students were then attending the following county schools:

| | |
|---|---|
| Walker Park | 1 |
| Carver | 5 |
| Monroe — Primary | 13 |
| — Elementary | 9 |
| — Area High | 2 |
| Loganville — Primary | 29 |
| — Middle | 24 |
| — High | 17 |
| | 100 |

The county board's response alleges that the out-of-zone attendance of these children is the result of the tacit agreement for more than twelve years of the defendant school boards. That response does not mention this court's December 17, 1971, order refusing to amend the 1968 decree to allow such attendance or the said 1973 contract

between these two boards by which they agreed for twenty-five years to the zone system they devised. The county also raised the same constitutional objections that were rejected by the Supreme Court of Georgia in 1972. 229 Ga. 114, 189 S.E.2d 690.

Defendant Social Circle responded by alleging that of these 100 students 99 are white and one is black.

In response to the county board's interrogatories of October 17, 1980, filed on March 23, 1981, the defendant Social Circle board stated that of the children then attending Social Circle schools the following is a breakdown as between those who live in the city and in the county portion of Zone 5:

| Outside City | – | Within City |
|---|---|---|
| 85 bl – 318 w | – | 367 bl – 228 w |
| 21% – 79% | – | 62% – 38% |

Totals for Entire Zone 5

| | |
|---|---|
| 85 bl | 318 w |
| 367 bl | 228 w |
| 452 bl | 546 w |
| 46% | 54% |

Under the 1968 decree Social Circle's system has 998 students of whom 46% are black and 54% are white; if the Zone 5 county students are removed, Social Circle is left with 595 students of whom 62% are black and 38% are white.

On November 26, 1979, Veda J. Baker and others filed an application to intervene as parents and next friends of their children who are attending county schools but who, under the court's 1968 decree, should be attending city schools.

Social Circle responded by suggesting that it is the proposed intervenors' purpose to resegregate the schools of Walton County. The city board pointed out that the proposed intervenors represent some 99 white students and that their further purpose is to cause most of their children to attend the now virtually all-white Loganville schools instead of Social Circle's fully and fairly integrated schools.

Defendant Walton County did not object to intervenors' application.

The court allowed the intervention on December 17, 1979, and then without ruling on an avalanche of intervenors' motions and demands refused to modify the 1968 decree. Intervenors appealed and the Fifth Circuit Court of Appeals, by the already quoted unpublished order, remanded the entire case to this court.

## CONCLUSIONS OF LAW

The court's dilemma in trying to determine the order in which the various motions and contentions should be considered, is well illustrated by the old saying "Which comes first, the chicken or the egg?" There being no conclusive answer to that question or to this court's dilemma they will be addressed in what seems to be the most logical order.

### PLAINTIFFS MOTION TO ADD MINOR BLACK STUDENTS AS PARTIES OR TO PERMIT THEIR INTERVENTION

In response to intervenors' motion to dismiss in which intervenors assert that (1) Judge Bootle did not comply with the mandatory requirement of Rule 23(c)(1) that "as soon as practicable after the commencement of an action brought as a class action, the court *shall determine by order* whether it is to be so maintained ..." as a class action; (2) the case therefore proceeded only in behalf of the individual named black parents and students, all of whom have now graduated from these public schools; (3) there is no longer an Article III or controversy between the original plaintiffs and these school boards; and (4) there is thus no present basis for this court's jurisdiction over these public schools; plaintiffs moved the court to add Eric Graves, a black eleventh grade student at Social Circle High School, and Angela Porter, a black ninth grade student at Social Circle High School, as additional party plaintiffs or alternatively as applicants for intervention.

Having studied this entire record and carefully considered every motion and brief, the natural tendency of the court is to utilize the result of that labor and decide

every motion with a reasoned lengthy opinion. On the other hand, since this motion, if granted, is dispositive of all of intervenors' attacks upon the present validity of this court's 1968 injunction, it will be considered first.

Eric Graves and Angela Porter are the proposed party plaintiffs and, in the alternative, applicants for intervention. Eric Graves is enrolled in the eleventh grade at Social Circle High School. Angela Porter is enrolled in the ninth grade at Social Circle High School. Both Eric Graves and Angela Porter are black and have the same interest in enforcing the 1968 consent injunctive order of this court as the original plaintiffs, one of whom—Anson Graves—is Eric Graves' older brother.

Although one of the parties to the present action disputes the power of the court to grant the motion to add the applicants as party plaintiffs, there is no dispute that both applicants are residents of Social Circle and are in attendance at Social Circle High School.

Rule 21 of the Federal Rules of Civil Procedure as here applicable, provides "... Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just...."

The issue to be decided, as movants suggest, is whether or not under Rule 21 party plaintiffs can be added for their announced purpose of enforcing a 1968 school desegregation consent injunctive order and judgment where there was never a contest over whether or not the case should proceed as a class action in behalf of black parents and students of these public schools; the desegregation portion of the case proceeded implicitly as a class action; a formal Rule 23(c)(1) order of certification was not entered but class action relief was nevertheless agreed upon and granted; and the original named plaintiff black students have left school and no longer have a legal interest in the continuing controversy over whether or not the 1968 consent desegregation order should continue to be enforced by this court.

7. Portions of plaintiffs' proposed findings are adopted as this court's findings.

If these black students were neither added as plaintiffs nor allowed to intervene and if this school desegregation lawsuit were dismissed for mootness, it is obvious that counsel for the original black plaintiffs and for these movants—all recognized as highly skilled lawyers in school desegregation cases—would immediately file a new desegregation complaint in this court. As plaintiffs[7] remind us, the federal courts have always insisted that actions raising substantial legal and factual issues are not to be dismissed for overly technical jurisdictional reasons where the only effect of the dismissal is simply the renewal of the lawsuit. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 394, 97 L.Ed. 1303 (1953); *Mullaney v. Anderson*, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1958); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Moore v. Ogilive*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) and *Board of School Commissioners of Indianapolis v. Jacobs*, 420 U.S. 128, 129, 95 S.Ct. 848, 849, 43 L.Ed.2d 74 (1979).

For example, in *Southern Pacific Terminal Co. v. ICC, supra*, a challenge was made to the validity of an order by the Interstate Commerce Commission which had expired during the course of the proceedings. Despite the expiration of the order, the Supreme Court held that the action was not moot since the issues presented were "capable of repetition, yet evading review." 219 U.S. at 515, 31 S.Ct. at 283. Similarly in *Moore v. Ogilive, supra*, where the plaintiffs sought to be certified as candidates in an election which had already been held, the Court rejected the suggestion that the action be dismissed as moot. Instead, the Court proceeded to an adjudication of the action since it was a "continuing controversy" that was capable of repetition, yet evading review. 394 U.S. at 816, 89 S.Ct. at 1494. *See also, Hecht Co. v. Bowles*, 321 U.S. 321, 327–328, 64 S.Ct. 587, 590–591, 88 L.Ed. 754 (1944). *Also, see* Notes, *Develop-*

*ments in the Law—Injunctions,* 78 Harv.L. Rev. 994, 1074–1077 (1965).

In *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), the Supreme Court emphasized again, in the context of a class action, the need to evaluate claims of mootness in terms of judicial economy and practical concerns. The plaintiff in *Sosna v. Iowa, supra,* challenged the validity of an Iowa statute requiring plaintiffs in divorce actions to be residents of the state for a year or more. The suit was commenced as a class action and duly certified.

The plaintiff had been a resident of Iowa for less than a year when the suit was commenced. By the time the case reached the Supreme Court, the plaintiff had satisfied the State's durational residency requirement, thus raising the issue of whether the action was moot.

The Supreme Court rejected the contention that the suit was moot. It based its holding on the fact that the controversy was capable of repetition and that the unnamed persons in the class certification order had the requisite interest in maintaining the litigation. The Court adopted this holding because otherwise many meritorious claims would, as a practical matter, be unredressed. Indeed, the Supreme Court in *Sosna v. Iowa, supra,* acknowledged its holding "draws strength from the practical demands of time." 419 U.S. at 400, 95 S.Ct. at 557.

The decision by the Supreme Court in *Mullaney v. Anderson, supra,* is a classic illustration of the use of Rule 21 to preclude a federal court from engaging in a useless and ineffective dismissal of a case as moot when it is manifest—as it is here—that the dismissal will, in all likelihood, merely lead to institution of another action, identical in scope and content to the original action, by persons whose identities are known and who obviously have standing to commence a new action.

In *Mullaney v. Anderson, supra,* the plaintiffs, the Alaska Fishermen's Union and its Secretary-Treasurer, instituted a suit in the district court on behalf of the nonresident union members for the purpose of enjoining the Tax Commissioner of the then Territorial Government of Alaska from imposing and collecting license fees of $5.00 for resident fishermen and $50.00 for nonresidential fishermen. The complaint charged that the taxation scheme unconstitutionally burdened interstate commerce and constituted an abridgement of the privileges and immunities of citizens of other states.

In the Supreme Court of the United States the petitioner-defendant for the first time challenged the standing of the respondent union and its Secretary-Treasurer to maintain the lawsuit. Faced with the prospect of having their action dismissed, the respondents-plaintiffs moved the Supreme Court for leave to add two of its members, both of whom were non-residents of Alaska and were subject to the alleged discriminatory tax scheme as parties.

The Supreme Court granted the motion to add the new parties, observing that:

"To grant the motion merely puts the principal, the real party in interest, in the position of his avowed agent. The addition of these two parties-plaintiff can in no wise embarrass the defendant. Nor would their earlier joinder have in any way affected the course of the litigation. To dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration." 342 U.S. at 417, 72 S.Ct. at 429.

Rule 21 has been applied by the Supreme Court in the context of a school desegregation case to prevent a lawsuit, or a major portion of it, from being dismissed as moot. In *Rogers v. Paul,* 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965), the plaintiffs commenced a class action to desegregate the public high schools of Fort Smith, Arkansas. Plaintiffs failed, however, to take action to certify the class. In its *per curiam* decision, the Supreme Court noted that:

"One of the students has since graduated and the other has entered the last high

school grade. A motion to add parties is made on behalf of two additional Negro students." 382 U.S. at 199, 86 S.Ct. at 359.

The Supreme Court further observed that:

"It is alleged therein, and not denied by respondents, that these students are in the 10th and 11th grades of high school and that they are members of the class represented, seeking the same relief for all the reasons offered by the original party plaintiffs." 382 U.S. at 199, 86 S.Ct. at 359.

In view of these facts, the Court granted the motion.

The circumstances in *Rogers v. Paul* parallel those of Walton County and Social Circle.

The desegregation plan adopted by the Fort Smith school board in *Rogers v. Paul, supra,* provided for the desegregation of only one grade per year. At the time the case was decided by the Supreme Court, the 10th, 11th and 12th grades were still segregated.

One of the original plaintiffs had graduated. The other plaintiff was in the 12th grade. In the absence of the motion to add party plaintiffs, there was arguably no plaintiff who had a judicially enforceable interest concerning the desegregation of the 10th and 11th grades. The addition, pursuant to Rule 21, of the two party plaintiffs, one of whom was in the 10th grade and the other of whom was in the 11th grade, served to insure that the original action was not moot with respect to desegregation of the 10th and the 11th grades.

The use of Rule 21 to add and substitute parties is discussed by Professor Moore in his treatise on *Federal Practice,* Vol. 3 ¶ 21.04(1)(2nd ed.) to wit:

"It has been held that Rule 21 is not a substitution rule, but contemplates the retention of a party or parties when another party is added or dropped, and therefore that a sole party plaintiff or defendant cannot be dropped and another added. This, however, seems an unduly narrow restriction of Rule 21, especially since the same result can be attained by a liberal interpretation of Rule 15 or amendments. In contrast, other courts have relied upon Rule 21 to authorize results which are the equivalent of substitution." Volume III, ¶ 21.04(1), p. 2907. *See, e. g., Hackner v. Guaranty Trust Co.,* 117 F.2d 95 (2nd Cir. 1941), *cert. denied,* 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520; *Vieser v. Harvey Estes Const. Co.,* 69 F.R.D. 370 (W.D.Okla.1975); *National Maritime Union of America v. Curran,* 87 F.Supp. 423 (S.D. N.Y.1949).

The Seventh Circuit Court of Appeals applied the *Mullaney* rule in its decision in *Du Shane v. Conlisk,* 583 F.2d 965 (7th Cir. 1978). Upon appeal the Seventh Circuit affirmed the district court's order permitting the Civil Service Commission of Illinois to be added, pursuant to Rule 21, as a party defendant after it became evident that the original plaintiff's claim for restoration of his promotional opportunities could not be granted in the absence of the Civil Service Commission as a party to the lawsuit.

Quoting the provisions of Rule 21 which stipulate that "[M]isjoinder of parties is not ground for dismissal of an action" and that "[p]arties may be dropped or added . . . at any stage of the action and on such terms as are just," the Circuit Court stated:

"Under this rule, it has been held that a party can be added sua sponte by the court after judgment for remedial purposes. *Reichenberg v. Nelson,* 310 F.Supp. 248 (D.Neb.1970). Indeed, the Supreme Court added parties under Rule 21 on appeal in *Mullaney v. Anderson* . . . ." 583 F.2d at 966.

Accordingly, the Court concluded that the district court "had the requisite power to bring the Civil Service Commission into the present action." 583 F.2d at 966.

Cases such as *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); and *Board of School Commissioners of Indianapolis v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1974), are not contrary to *Mullaney v. Anderson.* Al-

though these cases support the dismissal of uncertified class action when the plaintiff ceases to have a live interest in the outcome of the action, none of these cases nor any of the other cases cited by intervenors add party-plaintiffs in order to defeat the claim of mootness. Moreover, some of the courts in these cases raised the issue of Rule 21 on their own initiative, as Rule 21 clearly permits.

As already stated, applicant Eric Graves is enrolled in the 11th grade at Social Circle High School. Applicant Angela Porter is enrolled in the 9th grade at Social Circle High School. As evidenced by their proposed complaint in intervention, applicants stand in exactly the same position with respect to desegregation and the defendants as the original black student plaintiffs. Applicants' interest in this lawsuit is to secure and preserve the same rights bestowed by the 1968 consent injunction which the original plaintiffs obtained by agreement of the defendants.

Because the applicants and the original black parent and student plaintiffs have an identity of interests, "[t]he addition of these two parties plaintiffs would not have in any way affected the course of the litigation." *Mullaney v. Anderson, supra,* 342 U.S. at 417, 72 S.Ct. at 429. Moreover, it is as true here as it was in *Mullaney v. Anderson* that "[t]o dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration." *Id.*

Since the principles set forth by the Supreme Court in *Mullaney v. Anderson, supra,* and *Rogers v. Paul, supra,* are applicable in the instant action and since the original plaintiffs obtained the 1968 judgment herein prior to the decisions of the Supreme Court in *Sosna v. Iowa, supra; Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599

(1976); *Board of School Commissioners of Indianapolis v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1974), it is fair and just to grant the motion of the plaintiffs to add additional parties as plaintiffs.[8]

For all of these reasons the motion of the plaintiffs to add minor black students Eric Graves and Angela Porter as additional plaintiffs is granted. That portion of plaintiffs' motion having been granted, it is unnecessary to determine whether or not in the alternative they would also be permitted to intervene.

DEFENDANT SOCIAL CIRCLE BOARD'S MOTION OF JUNE 23, 1980, TO RECONSIDER AND VACATE ORDER ALLOWING INTERVENTION

On June 23, 1980, the defendant Social Circle Board of Education moved this court to reconsider its December 17, 1979, order allowing intervention; vacate that order and deny intervention. Its brief urges that the intervention of these parents in this more than ten year old school case is untimely; that these parents under the decisions of the Fifth Circuit Court of Appeals have no right to intervene in a school case to oppose implementation of a desegregation decree; and parents further have no right to intervene in this school case simply because they would have voted differently than the members of these boards of education voted when they agreed upon the 1968 decree which this court then approved and adopted and when these school boards contracted in 1973 with each other for twenty-five years. Intervenors hotly contest these assertions saying that there are but two reasons for their intervention—they as parents are interested in local school district autonomy and in the educational well-being of their children.

---

8. Permitting the original plaintiffs, whose case is moot, to file a motion to add parties is proper. *See Mullaney v. Anderson, supra. Also, see United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), where the Supreme Court, after plaintiff's claim had become moot, nevertheless held that plaintiff "was a proper representative for the purpose of appealing the ruling denying certification of the class." 445 U.S. at 407, 100 S.Ct. at 1214. See, also *Ford v. United States Steel Corp.,* 638 F.2d 753 (5th Cir. 1981).

In considering defendant Social Circle's motion for reconsideration this district judge has very carefully read every page of this voluminous record and likewise very carefully considered the briefs of each of the parties.

The already recited facts compel this court to conclude that the defendant school boards in the manner permitted by Georgia law entered into a twenty-five year contract in 1953 by which they agreed on the manner in which each school board would educate Walton County children residing in certain defined or zoned areas of Walton County. That contract resulted in the Social Circle Board educating only white city and county children and in the Walton County Board educating white and black children in all-white and all-black schools. In 1954 the Supreme Court of the United States decided *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and in 1955 decided *Brown II*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. In the early 1960's these school boards under HEW's threat of a loss of federal funds modified their 1953 contract to include the freedom to choose any school in either the city or county school system. When this lawsuit began HEW was demanding further modification and threatening cutoff of federal funds which flowed to both systems through the defendant county board. Without contesting the desegregation issues on the merits and with the specific concession that the plaintiffs were entitled to an injunction in this court, the defendant school boards through a committee of their board members met and agreed upon a plan to further desegregate these schools. That plan was embodied in a proposed injunctive order by the defendant school boards and submitted to this court. *That plan is the very same zone plan which is the subject of this controversy.* That plan as embodied by these school bodies in a proposed decree was considered and made the order of this court in 1968. As such it is in every material respect the result of the agreements of the members of these two local school boards in 1968. In no respect was it devised by the judge of this court who simply considered and signed it. In 1971 the county board petitioned this court to be permitted to back out of the agreed upon plan and decree by reclaiming the Zone 5 county children living outside the city of Social Circle. Under circumstances almost identical to today and in the face of similar arguments made then by the county board and today by the county board and these intervenor parents, this court declined to change the 1968 decree that these school boards had submitted by agreement.

The Supreme Court of Georgia on May 3, 1972, affirmed the authority of these school boards under Georgia law to contract. Satisfied of their authority to do so, these school boards then contracted again in 1973 for twenty-five years. In that contract the county agreed "to allow approximately 417 students living in the Walton County area to attend schools operated by the Social Circle Board of Education." The students referred to obviously were the Zone 5 county students. As such these school boards contracted in reality for the zone plan submitted to this court and made its decree in 1968, to continue for twenty-five years. This court was not asked to approve or disapprove of that agreement. Since that contract was consistent with the 1968 consent decree of this court, its approval wasn't necessary.

In spite of this court's 1968 consent decree, this court's refusal in 1971 to modify Zone 5 to put those residing outside the city limits of Social Circle back in county board schools; and the 1973 quoted contract of these two school boards "to allow approximately 417 students living in the Walton County area [of Zone 5] to attend schools operated by the Social Circle Board of Education" and to allow the Social Circle Board to report those students for ADA and receive state funds for those students, a substantial number of Zone 5 students began attending Walton County schools instead of Social Circle schools. At the time this fracas began we now know that 99 white and one black Zone 5 student were attending county schools and that the particular schools they were attending have a greater

percentage of white students than the Social Circle schools have.

Attached as appendices (App. III and IV) are copies of a report of defendant county board showing enrollment by race and school from 1973 through the most recent school year, and a report of defendant city board showing its anticipated Fall-1981 enrollment. The court concludes from the reported fairly constant number of black students and a steady increase in total white county board students—3,878 in 1973–74 to 4,361 in 1979–80—and the decline of county board white students to 4,191 after the 1968 decree was enforced in 1980–81, that the county board for quite some time has permitted white students residing in Zone 5 to withdraw from Social Circle schools and attend Walton County schools.

As parents of Zone 5 children—99 white and one black—who were attending county schools when they should have been attending city schools, these parents by their intervention seek not to cause the 1968 agreed upon desegregation injunction of this court to be implemented but instead they seek to overturn, modify, and defeat that order. If successful in their purpose to thereby return all Zone 5 outside of Social Circle children to county board schools, Social Circle's schools which are anticipated to have 557 white and 462 black students for the 1981–82 school year would have only 228 white and 367 black students—a change from the present 54% white and 46% black student body to a 38% white and 62% black student body. The Walton County schools in turn would become less black and more white.

The Fifth Circuit Court of Appeals—as this court was recently reminded in *Adams, et al. v. Baldwin County Board of Education*, 628 F.2d 895 (5th Cir. 1980)—has decided under what circumstances parents are to be permitted to intervene in school desegregation cases. That Fifth Circuit decision was in the 1973 case of *Hines v. Rapides Parish School Board*, 479 F.2d 762 (1973). This district court in common with all district courts within the Fifth Circuit is

required to follow and apply that decision. As may be material to a consideration of this motion for reconsideration, the Fifth Circuit in *Hines* stated:

"I. The plaintiffs in this action are a group of parents, both black and white, whose children were assigned to or are attending a school within the Rapides Parish School System in which black pupils are in a majority. Three of the parents are black and the rest are white. Two of the black parents sent their children to the predominantly white schools where they were assigned in compliance with Valley and state that they are satisfied with the education the children are receiving and agreed to be plaintiffs only because they were requested by some of the other plaintiffs. The third black plaintiff took advantage of the majority to minority transfer system in order to have his child attend Alexandria Senior High School, the newest school facility in the parish. Following the assignment of their children to the predominantly black schools in that district, none of the white parents named as plaintiffs allowed their children to attend for even a single day. Two of the plaintiffs sent their children to live with relatives elsewhere; three others sent their children to private academies; and two more moved out of the school zone to escape the assignment to the predominantly black school. With these factors in mind, we turn to consider previous federal court desegregation actions involving Rapides Parish.

"The original *Valley v. Rapides Parish School Board* [434 F.2d 144 (5 Cir. 1970)] case was a class action filed in March of 1965, seeking broad injunctive and declaratory relief covering virtually all aspects necessary in desegregation of the school system. The plaintiffs in this action were black students and parents of black students attending the public schools in Rapides Parish. The United States was an active plaintiff-intervenor in that suit. A biracial committee was appointed in that case by the district court in September of 1970. This committee consisted of 11 blacks nominated by the plaintiffs and

11 whites nominated by the school board. Pursuant to a plan drafted by the Department of Health, Education and Welfare, and approved by both the school board and the biracial committee, active steps were taken to integrate the various schools in the parish.

"The children in Ward * (the domicile of all of the plaintiffs in the present Hines case at the time of assignment) were assigned to Peabody High School and Jones Street Junior High School. The adopted plan led to the assignment of 501 white students and 863 black students to Peabody High, and 280 white students and 763 black students to Jones Street Junior High. Following this order and the resulting assignment, there was a public outcry and an organized boycott of Peabody and Jones Street schools by white students and their parents. Substantially less than a third of the white students assigned to these schools ever attended them. Thus, the goals sought in the implementation of the initial plan had been somewhat frustrated by these subsequent events.

"As the district court points out in its opinion in this case, the problems caused by this boycott are fully aware to the parties involved in the Valley case. It is apparent that the Valley case itself is not a closed file but rather it is indeed still an active viable lawsuit under the control of the district court.

\*　　\*　　\*　　\*　　\*　　\*

"II. The district court refused to allow the Hines plaintiffs to proceed as class representatives and ultimately dismissed the suit. The essence of the district court's decision is that the original Valley plaintiffs are still active and are the proper parties to represent the interests which the Hines plaintiffs allege they desire to present.

\*　　\*　　\*　　\*　　\*　　\*

"III. In resolving this appeal this court must attempt to set out a method which allows parent groups to present their complaints about the school system which results from a desegregation order *with-out fostering a multiplicity of new lawsuits over the same complicated and emotional issues which have already once been fought out in an all too lengthy court battle.* Certainly every group must be allowed the opportunity to show the court that the desired and legally required unitary school system has not been achieved by an earlier court order. We feel that there is a simple method for achieving this desired result without undue confusion and a multiplicity of lawsuits.

"As pointed out above, the earlier desegregation order clearly provided that the district court in the Valley case retained jurisdiction 'in order to assure that the provisions of this judgment and any other matters pertaining and incidental to the preservation of a unitary public school system ... shall be sufficiently and effectively carried out.' (emphasis supplied). The Hines complaint alleges that these plaintiffs seek institution of a unitary school system which they allege has failed to manifest itself under the earlier desegregation order. Their allegations seem to place them clearly within the area of jurisdiction retained by the district court in the Valley case.

"Therefore, we feel that the proper course for parental groups seeking to question current deficiencies in the implementation of desegregation orders is for the group to petition the district court to allow it to intervene in the prior action.[1] The petition for intervention would bring to the attention of the district court the precise issues which the new group sought to represent and the ways in which 'the goal of a unitary system had allegedly been frustrated. The district court could then determine whether these matters had been previously raised and resolved and/or whether the issues sought to be presented by the new group were currently known to the court and parties in the initial suit. If the court determined that the issues these new plaintiffs sought to present had been previously determined or if it found that the

parties in the original action were aware of these issues and completely competent to represent the interests of the new group, it could deny intervention. If the court felt that the new group had a significant claim which it could best represent, intervention would be allowed.[2]

"IV. In light of the district court's strongly worded opinion in this case we perceive no reason which would justify remanding this case to allow the plaintiffs to seek intervention. We find substantial support for the conclusions drawn by the district court with regard to these plaintiffs. The decision of the district court is, therefore,

Affirmed." (emphasis added)

[1] It appears from the transcript portion reproduced in the district court's opinion that these Hines plaintiffs did make an attempt to intervene in the Valley suit but that that motion was denied. The court's apparent rationale was that there was 'final judgment' in the Valley case. Such a ruling is erroneous for it overlooks the broad retention of jurisdiction found in the Valley opinion.

[2] In most school integration cases such intervention would most likely consist of the opportunity to present the claims to the court and to any group, such as the biracial committee in this case, working under the court's supervision to achieve a unitary system and to have the allegations considered on the merits. Where a committee is involved, the court might feel it desirable to allow the new group representation on that body. This procedure would seem adequate to ensure that different points of view would be presented in the difficult and often emotional struggle to achieve the constitutionally mandated but highly elusive unitary school system."

The Fifth Circuit speaking more specifically to the issue of what parental interest justifies intervention by parents in a school desegregation case, stated in the 1979 case of *Pate v. Dade County School Board*, 588 F.2d 501, 503:

"The parental interest that justifies permissive intervention is an interest in a desegregated school system. Here, as in the Perry County case, '[t]he parents are not seeking to challenge deficiencies in the implementation of desegregation orders . . . .' *United States v. Perry County Board of Education*, supra [567 F.2d 277] at 279 [5th Cir.]. They oppose such implementation. Their complaint is that the school board does not also oppose such implementation, but we have held that 'Appellants are not entitled to intervention of right simply because they would have voted differently had they been members of these representative bodies.' *United States v. Perry County Board of Education*, supra at 280."

Intervenor parents are interested in having their children attend the public schools operated by the Walton County Board of Education instead of those operated by the Social Circle Board of Education. This court's 1968 decree which embodies the agreement of the Walton County Board of Education and the Social Circle Board of Education, requires the children of intervenor parents to attend Social Circle schools. These parents are thus interested in opposing the continued implementation of the desegregation plan which was agreed to by *their duly elected and appointed school boards* and which at the request of *their school boards* was made the order of this court. Today—some thirteen years later—they wish to challenge and modify what their school boards in good faith did in 1968 to prevent twenty-five percent of their total school budget from being cut off by HEW; to comply with the desegregation decisions of the Supreme Court of the United States and the Fifth Circuit Court of Appeals; and to cause these school systems to be operated in a desegregated manner. They further wish to differ with the twenty-five year contract that their school boards voluntarily entered into in 1973 for the purpose of confirming the right of Social Circle to receive state monies for the Average Daily Attendance of Zone 5 children living outside Social Circle and the obligation of Social Circle to educate those children then numbering "approximately 417 . . . "

These intervenor parents are to be commended for having an interest in the education of their children and for their willingness in pursuit of what they believe to be for the best interest of their children to

differ with the agreements of their boards of education as now embodied in the 1968 decree of this court. That commendable interest and willingness, however, is not the interest that gives them the right to intervene in this thirteen year old public school desegregation lawsuit.[9]

In the 1968 decree of this court the last sentence reads "The court retains jurisdiction for the purpose of implementation of this decree." That sentence has not been modified in any way.

The issue of whether or not Zone 5 children residing outside Social Circle should be permitted to exit Social Circle schools and enter Walton County schools was heard by Judge W. A. Bootle of this court in 1971. In a written order from which no appeal was taken Judge Bootle refused to modify the 1968 decree to permit those Zone 5 children to change to county schools. The issues intervenor parents wish to pursue today are those same issues which have already been determined.

The parties to the original lawsuit including the now added plaintiffs, the defendant Walton County Board of Education, and the Social Circle Board of Education, as evidenced by their vigorous representation of their respective, differing views to this court, are keenly aware of these issues and completely competent to represent the interests of all the parents and students of Walton County, including the intervenor parents and their children.

It is thus apparent that this court erred in allowing these parents to intervene and that its error should be and is hereby corrected by vacating its December 17, 1979, order allowing Veda J. Baker and others to intervene.

### OTHER MOTIONS

Having added two minor black students now attending Social Circle High School as additional plaintiffs and having vacated the December 17, 1979, order allowing Veda J.

Baker and others to intervene, it is unnecessary to decide any other motions or issues. With the addition of those party plaintiffs it is clear that this court has and is required to exercise its jurisdiction over the desegregation of these public schools.

The parents of each of the 100 children who were but are not now attending out of Zone 5 schools, are entitled to a copy of this order so that they can read it in its entirety and know of the court's reasons for the action taken. For that purpose the Clerk is directed to obtain the names and mailing addresses of those parents and to then mail a copy of this order without cost to each.

### APPENDIX I

STATE OF GEORGIA

COUNTY OF WALTON

This agreement made and entered into this 21 day of July, 1953, between the Board of Education of Walton County, Georgia, party of the first part, hereinafter sometimes as a matter of convenience referred to as the County Board, and Board of Trustees of Social Circle Academy, party of the second part, hereinafter sometimes as a matter of convenience referred to as the City Board.

### PROVISIONS AS TO WHITE SCHOOLS

Witnesseth, the City Board hereby agrees to enroll in the Social Circle Public School all children from the area hereinafter described and to extend to these children the same privileges and opportunities enjoyed by the school children residing in the City of Social Circle.

(a) The area now served by the Social Circle Public School shall be designated as the regular Social Circle attendance area for all grades, however, subject to the provision that there is excepted from said area any of such area which lies outside of Walton County. The area now served is described as follows:

---

9. Even if these parents had the right to intervene, their application for intervention in this thirteen year old lawsuit is clearly untimely. Rule 24(a), Fed.R.Civ.P.; *United States v. Mari-*

on County School District, 590 F.2d 146 (5th Cir. 1979). *See also, Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977).

The bus routes that were set up for Allen D. Kilgore and Buck Brown for the school year 1952–53 are described as follows: (Also see attached map.)

### Allen D. Kilgore

First Load: Go up Highway No. 11, turn right just above first railroad crossing, keep this road to Johnny Studdard's, turn around at Spinks', cross Browning Shoals, in bad weather turn left at Kilgore's, turn around at Harry Arnold's place, pass Holland Malcom's and turn left at cross roads, at Allen's turn right and come back to town by Bailey's crossing and Highway No. 229.

Second Load: Go up Highway No. 11, turn right just above first railroad crossing, turn left going by Ralph Adams', turn right at Foster Peters', pass Cliff Rogers' and turn right at cross roads, come back into town on this road and Highway No. 11.

### Buck Brown

First Load: Go out Highway No. 11, turn left at Thomas Queen's, go to Harry Arnold's place and turn around, come back to highway by Rufus Smith's and Blasingame's, turn left on Highway No. 11, go to cross road and turn right, go to Grady Lemonds' and turn right, come back into town by Simons' and Lasseter's to Highway No. 11 and on into town.

Second Load: Go out Highway No. 229 to Oasis, turn right on Highway No. 12 to Hub Junction, turn right on Highway No. 11 and back to town.

Third Load: Take left fork at Sanford Clegg's, turn around at Cardell's and back to town.

(b) Pupils residing in the Jersey attendance area shall be eligible to attend the Social Circle School on completion of the eighth grade at the Jersey School. Such area shall be accepted as a part of the regular attendance area for the Social Circle School and shall include all the area served by the bus route for the Jersey School as set up for the school year 1952–53. The approximate area served as shown on attached map.

(c) At such time as the official application of Walton County is presented for the school building program the attendance areas will be re-defined and defined with the Social Circle School retaining the area outlined in paragraphs (a) and (b) above with the City Board accepting any additional areas as worked out by mutual agreement between the County Board and the City Board and shall become a part of this contract.

(d) The County Board agrees to pay all teachers in the Social Circle School salaries as prescribed by the State Board of Education.

(e) The County Board shall receive the amount of State funds per teacher for maintenance and operation.

If the amount of such funds received amounts to more than the charge back as prescribed by the State Board of Education for the City of Social Circle, the County Board will pay to the City Board the difference, and if such funds received by the County Board amounts to less than such charge back the City Board will pay the difference to the County Board, this is to be adjusted annually and shall be applicable on an annual basis only. Such adjustment shall be made and the money paid under these provisions on or before January 15 of each year.

(f) The amount of State funds per teacher for capital outlay shall be credited to the City Board.

(g) The County Board agrees to provide one additional teacher in addition to the number of teachers actually earned by the City Board or if this additional teacher is not provided, to pay to the City Board the salary of the teacher based on four year professional certificate with no credit for teaching experience, the City Board having the right to elect whether the additional teacher shall be provided or the salary paid for such additional teacher to the City Board; in addition thereto the County Board agrees to pay to the City Board the maintenance and operation fund amount allocated by the State Board for such additional teacher.

(h) A pro rata share of the library and textbook funds allocated by the State shall

be paid to the City Board by the County Board in the same manner as allocated by grades by the State Department of Education on all children attending the Social Circle School.

The contingent or equalization fund now being received by the County from the State is $28,836.00. To that figure will be added the amount that would have been received from the contingent or equalization fund by the County Board had the County Board been operating and reporting the attendance in Carver School in City of Monroe for the school term 1952–1953; the total amount of said two sums is designated as the basis fund. It is agreed that if the contingent or equalization fund which may be received by the County Board should be decreased from said basis fund then such percentage of any decrease shall be deducted by the County Board from maintenance and operation funds paid to the City Board by the County Board; should such funds increase from said designated basis fund such percentage of any increase shall be passed on to the City Board by the County Board.

The County Board further agrees to pay to the City Board a proportionate share, based on average daily attendance and/or teacher allocations, of any new or additional funds from sources outside Walton County that may be allocated in the future, but which are not specifically allocated to a specific school for a specific use which would by its nature prohibit any such allocation of such funds to the City Board.

Each Board agrees to make an adjustment on allocation of teachers and maintenance and operation fund based on average daily attendance in the event of increase or decrease in average daily attendance sufficient to warrant the employment or dismissal of a teacher or teachers due to such increase or decrease of average daily attendance. It is anticipated that this will take place upon the completion of the building program due to movement of grade or grades. This adjustment will be made at the beginning of any school term in which due to some movement of students or reassignment of students it is necessary for either Board to employ a teacher or teachers beyond the number earned in the previous years average daily attendance. Notice of any change shall be given by March 1 preceding the opening of the school term at which such change takes effect.

All white pupils attending Social Circle School will be reported through the County office.

The County Board agrees to transport without cost to the City Board all pupils who are entitled to transportation residing outside of the city limits of Social Circle, Georgia.

The City Board also agrees that dates relating to the opening of schools in the Fall, holidays to be granted during the year and the closing of schools in the Spring shall be agreed on by the two Superintendents. The hours relating to the daily opening and closing of schools shall also be agreed on by the two Superintendents.

The City Board also agrees to continue the Agricultural and Home Economics as heretofore.

PROVISIONS AS TO NEGRO SCHOOLS

The County Board agrees to build, under the provisions of the law relating to the State School Building Authority, a school building as approved by the State School Building Authority on the present site of Social Circle Training School.

The County Board agrees to accommodate negro pupils of Social Circle and as many others as the County Board desires from outside the city limits of Social Circle; to operate said school from State and County funds without cost to the City Board; the County Board shall have the right to designate what grades shall attend such school, however, with the understanding that all negro pupils residing in the City of Social Circle shall be given the opportunity to attend the Social Circle School at least through the elementary grades and it shall be in the discretion of the County Board as to any grades beyond the elementary grades. However, all negro students residing in the City of Social Circle shall be provided the opportunity of attending a high school in the County, however, not necessarily in the City of Social Circle.

The County Board will report all attendance of negro children in said school and receive all funds allocated for the operation of such negro school by the State.

The County Board will not assume the charge back on any teachers earned by city children in such school.

The City Board agrees that City of Social Circle shall deed to the County Board the present buildings and grounds on site of Social Circle Training School, which are described as follows:

All that tract or parcel of land lying and being in the City of Social Circle, Walton County, Georgia, containing twelve and three-tenths (12.3) acres, more or less, and being the colored school tract in the City of Social Circle, known as the Social Circle Training School, and bounded as follows: On the Northeast by land of B. A. Malcom; on the Southeast by the Fairplay-Social Circle road; on the Southwest and Northwest by right of way of the Georgia Railroad and also on the Northwest by Social Circle Colored Cemetery.

Said land is the same land conveyed to City of Social Circle by The Federal Land Bank of Columbia by deed dated December 16, 1935, and recorded in Deed Book 17, page 549, office of the Clerk of Walton Superior Court, with the exception of that part of said land used as Social Circle Cemetery and shown by plat made by E. M. Wayne, Jr., C. E., September 21, 1943, which plat is filed in the Clerk's office of City of Social Circle, Georgia, and reference is made thereto for description.

This contract shall be for the term of twenty-five (25) years, beginning July 1, 1953. At the expiration of this contract, if some mutual agreement cannot be worked out between the parties concerned, the above contract will be extended for a period of twenty-five (25) years.

A joint meeting of the two Boards shall be held annually between February 1 and March 1 for the purpose of a discussion of mutual school affairs. The time of the meeting shall be decided by the Chairman of each Board.

It is further agreed that City of Social Circle will apply for the enactment of a local bill at the next session of the Georgia Legislature amending the charter of City of Social Circle removing any apparent inconsistencies between the charter of City of Social Circle and the Constitution and laws of the State of Georgia.

This contract shall not be construed that any inconsistency exists but to remove all possible doubt, it is the thought of all parties concerned that the charter of City of Social Circle should be so amended.

In Witness Whereof we have hereunto affixed our hands and seals this      day of      , 1953.

THE BOARD OF EDUCATION OF WALTON COUNTY, GEORGIA

By: _____ J. J. Byrd _____ (SEAL)
Chairman

_____ Cliff Rogers _____ (SEAL)
Member

_____ U. J. Robison _____ (SEAL)
Member

_____ Homer L. Moon _____ (SEAL)
Member

_____ _____ (SEAL)
Member

Attest:

Clyde C. Pearce, Jr.
Superintendent, Walton County
Schools and Secretary of said
Board of Education

BOARD OF TRUSTEES OF SOCIAL CIRCLE
ACADEMY

By: _____ (SEAL)
   Chairman

_____ (SEAL)
Member and Secretary

_____ (SEAL)
Member

_____ (SEAL)
Member

_____ (Seal)
Member

Attest:

_____
Superintendent of Schools of
City of Social Circle

     Approved by the Mayor and Council of the City of Social

Circle pursuant to resolution duly adopted.

     This 23 day of July , 1953.

_____ (SEAL)
Mayor

_____ (SEAL)
J. C. Shepard Jr.

_____ (SEAL)

_____ (SEAL)
Adair Read

_____ (SEAL)
W. B. Wofford
Councilmen

     CITY OF SOCIAL CIRCLE

Attest:

_____
Clerk, City of Social Circle

ORDER DENYING MOTION OF WAL-
TON COUNTY BOARD OF EDUCA-
TION TO ALTER ATTENDANCE
ZONE LINES IN ZONE 5

This litigation began in early 1968, when a class action was filed by plaintiffs seeking various measures of relief including integration of the public schools in Walton County, Georgia. There were then and are now two public school systems in said County, the Walton County School system, operated by the County Board, and the independent school system, operated by the City Board of Social Circle, Georgia. After considerable litigation and appropriate hearings, a final decree was entered by this court on July 29, 1968, providing for integration of all schools in the County, including both systems. This final decree was a consent decree specifically consented to by both the Walton County Board of Education and the Social Circle Board of Education. This consent decree divided the entire county into 5 attendance zones numbered 1 through 5. The present motion concerns particularly Zone 5, which includes geographically the City of Social Circle and the 2 schools situate therein. Before this litigation began and before said final decree there was situate in the City of Social Circle an all-black Social Circle Training School which was operated by the County Board under an agreement between the two Boards and there was also situate in Social Circle the Social Circle public school operated by the City Board. Zone 5 geographically includes roughly a one-fifth portion of the entire county including the City of Social Circle and the consent decree embraced an agreement between the two Boards that all students residing in Zone 5 would be schooled henceforth in said two schools, the old Social Circle Training School and the Social Circle public school *under the operation of the City Board*. In accordance with said agreement this court entered as paragraph "E" of Paragraph VII the following:

"E. Beginning with the 1968–69 school year all students residing in zone 5,
grades 1 through 4, will be housed at Social Circle Training School. In zone 5, kindergarten and grades 5 through 12 will be housed in Social Circle Public School. The County Board and the City Board have made an agreement which includes financing arrangements for Social Circle Training School and Social Circle Public School to be operated by the City Board. This was necessary by reason of the fact that the City Board is under Georgia law a separate and independent system from the County Board."

Thus it was represented to the court by both Boards that they had "made an agreement which includes financing arrangements for Social Circle Training School and Social Circle Public School to be operated by the City Board."

On or about August 6, 1971 the County Board filed the pending motion asking this court to amend the final decree so as to provide that all students residing within Zone 5 be educated by Walton County Board of Education exclusive of those residing within the City Limits of the City of Social Circle, and that those students residing within the City Limits of Social Circle be educated by the Social Circle's City Board. Timely objections were filed by the City Board urging that no change be made in said final decree. Also, a response was filed on behalf of the original complainants expressing complete satisfaction with said final decree and urging that no change be made without the court's first assuring itself that any change contemplated would not in any way militate against the desegregation satisfactorily accomplished under the present decree.

An evidentiary hearing on said motion was held on September 13, 1971, after which both Boards presented written arguments and the motion is now ready for decision.

It appears that indeed the two Boards had made an agreement which included the financing arrangements for the two Social Circle schools as recited in said final decree. The agreement had its genesis in a long seven-page typed contract executed by the two Boards dated July 21, 1953, which contract provided, among other things, that the County Board would build and operate the said Social Circle Training School "to accommodate Negro pupils." Said written contract was departed from, supplemented and amended from time to time by oral agreements between the two Boards. While the two Boards were in complete agreement as to said "financing arrangements" at the time the final decree was entered and for some time thereafter, later some differences began to develop as to said financing arrangements, and in May, 1971, the State Board of Education filed in the Superior Court of Walton County its bill of interpleader naming as defendants the said two Boards and seeking direction from said court as to the proper distribution of funds held by the State Board of Education for the benefit of the school children in Walton County. The Superior Court of Walton County assumed jurisdiction of the cause and after extensive hearings, entered appropriate decrees settling and determining the respective rights of the two Boards to said funds at least through the school year 1970–71. The Superior Court of Walton County decided, inter alia, that the original written contract entered into in 1953 was indeed null and void under the doctrine of *Brown v. Board of Education*, 347 U.S. 483, and for the further reason that it had been abrogated by the mutual consent of the parties by certain actions taken by them including the "annual negotiation of the terms of settlement for services rendered reciprocally by the respondents to each other, such actions and settlements differing from those provided for in the contract entered into in 1953."

The County Board argues that since said original contract has been judicially declared to be null and void there is no reason now why this court should not amend its decree so as to permit the City Board to educate only students living in Social Circle and to permit the County Board to educate all others living in the County. The City Board points out, however, that the agreement for financing referred to in this court's final decree was not said original written agreement of 1953 but said agreement as modified or replaced by the "annual negotiation(s)" as found by the State Court. The City Board contends further that it is anxious and willing to continue to abide by said agreement and that the County Board is reneging thereon. It is not necessary that this court determine which party to said agreement is at fault. It is noted, however, that the State Court determined that the County Board was indebted to the City Board in certain amounts.

It appears that the City Board had in its two schools a total enrollment of 1,095 as of September 2, 1971, 562 white—533 Negro. It appears further that approximately 500 or one-half of said total enrollment would be taken away from the two City schools if the County Board's motion were granted. The City Board contends that it has an excellent educational system in said two schools as they are now operating and that it is questionable whether they could continue their present standard of excellence if they were deprived of approximately one-half of their students. It is significant also that the County Board does not attack or question the excellence of the City school system. The County Board's contention chiefly is that there is no longer any agreement as to financing arrangements and that it would be desirable from the County Board's point of view that the contractual arrangements be terminated and each system operate independently of the other, each system thus being free to deal directly with the State Board of Education with respect to funds to be distributed by the State Board and that each system be free to finance its own schools insofar as local taxation is concerned. The County Board contends further that there are certain capital

outlay funds procurable from the State Board of Education only if: (1) the five hundred plus students are returned to the County system, or (2) the City Board and the County Board enter into a long term contract for a minimum of twenty-five years in order that the State can know where the children will be housed and which system will have the responsibility for housing them. The City Board replies that there is no reason why such a long term contract cannot be entered into, if, indeed, one is required, and that in any event the County Board joined the City Board at the time of the final decree in advising the court that the two Boards had made an agreement for financing arrangements. The written agreement of July 21, 1953 was such a long term contract. It provided in part:

"This contract shall be for the term of twenty-five (25) years, beginning July 1, 1953. At the expiration of this contract, if some mutual agreement cannot be worked out between the parties concerned, the above contract will be extended for a period of twenty-five (25) years."

Of great importance are the facts that (1) excellent educational opportunities are being provided for all children both in the City schools and in the County schools, and (2) under the consent decree desegregation has been fully accomplished, at least to the extent that no one is complaining with respect thereto.

In the last brief filed on behalf of the County Board the Board proposes to the court that to aid the court in knowing where these five hundred plus students would be housed and educated the County Board on or before June, 1972 will make a survey of these students as to grade and race and then report to this court where the County students will be housed and educated and transported if its motion is allowed.

All things considered, this court is of the opinion that movant has failed to show any

satisfactory reasons for changing the decree as proposed in its motion. Admittedly, desegregation has worked well under the existing zones. Admittedly, a good education is being provided for all students in both systems. It is not shown or even contended that the modifications urged would be in the best interest of the school children of Walton County. Moreover, whatever difficulties exist with respect to implementing and enforcing the oral agreements between the two Boards as referred to in this court's final consent decree are being adequately resolved and handled by the Superior Court of Walton County, Georgia.

It is entirely too soon as against the showing made to authorize the change requested by one system and opposed by the other. Given time the parties may resolve their difficulties.

One unfortunate aspect of every court decree initiating or increasing desegregation is the concomitant confusion caused students and parents with respect to change in schools to be attended. Stability in this matter is highly desirable. It can be assured here, at least for the immediate future, by denying the motion.

Accordingly, the prayers of said motion are hereby denied.

SO ORDERED this 17 day of December, 1971.

/s/ W. A. Bootle
CHIEF JUDGE

At a meeting of the Board of Education of Walton County held on the 21st day of July, 1953, the following contract between this Board and Board of Trustees of Social Circle Academy was submitted for final action and the said contract was approved and authorized to be executed by all members of this Board and attested by the Superintendent of Schools of Walton County, Georgia, the said contract to be executed in triplicate, one for this Board, one for the

Board of Trustees of Social Circle Academy of City of Social Circle, and one for the Mayor and Council of the City of Social Circle.

This is to certify that this is an exact copy of the above resolution as it appears on the Minute Book of the Walton County Board of Education.

*Clyde C. Pearce, Jr.*
~~Secretary-Treasurer~~

At a meeting of Board of Trustees of Social Circle Academy held on the 21 day of July, 1953, the following contract between this Board and the Board of Education of Walton County was submitted for final action, and the said contract was approved and authorized to be executed by all members of the Board and attested by the Superintendent of Schools of City of Social Circle, the said contract to be executed in triplicate, one for the Board of Trustees of Social Circle Academy, one for the Board of Education of Walton County and one for the Mayor and Council of City of Social Circle.

This is to certify that this is an exact copy of the above resolution as it appears on the minutes of the Board of Trustees of Social Circle Academy.

G.A. Rutherford, Sec.

Whereas, Board of Trustees of Social Circle Academy and the Board of Education of Walton County have agreed upon a certain contract between the said Boards, said contract being hereto attached; and

Whereas, it appears that it is to the best interest of the County of Walton and the City of Social Circle that the said contract be duly approved by this body;

Now Therefore, upon motion made and duly carried and approved,

It is ordered that said contract be and it is hereby approved and that the approval of said contract be executed by the Mayor and Councilmen of City of Social Circle and attested by the Clerk and that the contract be recorded upon the Minutes of this body, and that the land and improvements described therein, known as Social Circle Training School in the City of Social Circle, be conveyed to the Board of Education of Walton County, Georgia, by City of Social Circle by deed and that said deed be executed on behalf of City of Social Circle by the Mayor and attested by the City Clerk.

It is further ordered that charter of City of Social Circle be amended at the next session of the Georgia Legislature by a local law removing any apparent inconsistencies between the charter of City of Social Circle and the Constitution and laws of the State of Georgia with reference to building of schools, it being doubtful whether any inconsistency really exists, but in order to remove all doubt it is the desire of this body that the charter of City of Social Circle be so amended.

Adopted this 23rd day of July, 1953. This is to certify that this is an exact copy of the above resolution as it appears on the minutes of the Mayor and Council of the City of Social Circle.

*Mrs. P. A. Hale*
Mrs. P.A. Hale, Clerk

Appendix III

WALTON COUNTY SCHOOLS

Students Enrolled 1973–1981

| | 1973–74 | | | 1974–75 | | | 1975–76 | | | 1976–77 | | | 1977–78 | | | 1978–79 | | | 1979–80 | | | 1980–81 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | 0 | White | Black | 0 | White | Black | 0 | White | Black | 0 | White | Black | 0 | White | Black | 0 | White | Black | 0 | White | Black | 0 |
| Carver | 391 | 249 | 0 | 476 | 282 | 0 | 466 | 276 | 0 | 431 | 282 | 0 | 428 | 316 | 0 | 409 | 290 | 1 | 382 | 281 | 0 | 357 | 302 | 2 |
| Loganville Primary | 942 | 98 | 0 | 1001 | 77 | 0 | 1052 | 65 | 0 | 574 | 36 | 1 | 748 | 49 | 0 | 765 | 49 | 6 | 811 | 44 | 0 | 700 | 46 | 10 |
| Loganville Middle | | | | | | | | | | 648 | 39 | 3 | 656 | 41 | 0 | 648 | 40 | 9 | 684 | 41 | 0 | 657 | 37 | 9 |
| Loganville High | 601 | 77 | 1 | 652 | 67 | 0 | 678 | 64 | 0 | 630 | 53 | 2 | 498 | 45 | 0 | 520 | 30 | 5 | 517 | 33 | 0 | 587 | 32 | 7 |
| Monroe Primary | 476 | 485 | 0 | 467 | 458 | 0 | 450 | 488 | 0 | 434 | 438 | 2 | 479 | 421 | 1 | 509 | 407 | 0 | 538 | 406 | 1 | 478 | 405 | 1 |
| Monroe Elementary | 487 | 324 | 0 | 477 | 350 | 0 | 445 | 363 | 0 | 398 | 375 | 2 | 378 | 358 | 3 | 373 | 362 | 2 | 369 | 340 | 1 | 396 | 326 | 0 |
| MACHS | 576 | 270 | 0 | 553 | 292 | 2 | 597 | 302 | 0 | 598 | 349 | 0 | 593 | 367 | 0 | 629 | 418 | 0 | 650 | 450 | 1 | 638 | 450 | 0 |
| Walker Park | 405 | 131 | 1 | 367 | 131 | 1 | 435 | 148 | 1 | 393 | 189 | 1 | 430 | 125 | 1 | 380 | 106 | 1 | 410 | 104 | 0 | 378 | 101 | 0 |
| Total | 3878 | 1634 | 2 | 3993 | 1657 | 3 | 4123 | 1706 | 1 | 4106 | 1711 | 11 | 4210 | 1722 | 5 | 4233 | 1702 | 24 | 4361 | 1699 | 3 | 4191 | 1699 | 29 |

Appendix IV

**Social Circle City Schools**

[SEAL]

|  | HIGH SCHOOL |
| JOHN T. BURKS, SUPERINTENDENT | JOHNNY B. BLACKSHEAR, JR. |

TELEPHONE 464–2611
SOCIAL CIRCLE, GEORGIA 30279

MIDDLE SCHOOL
JEFFERY C. WELCH

July 14, 1981

ELEMENTARY SCHOOL
JOHN W. GREGORY

Mr. John P. Cowart, Clerk
United States District
Middle District of Georgia
Federal Building
Macon, Georgia   31201

Re: REPORT AS REQUIRED BY THE COURT OF ANSON GRAVES, ET AL *VS* WALTON COUNTY BOARD OF EDUCATION, ET AL:

ANTICIPATED STUDENT ENROLLMENT — FALL 1981

| Grade | White | Black | TOTAL |
|---|---|---|---|
| Kindergarten | 31 | 23 | 54 |
| EMR | 1 | 12 | 13 |
| 1st Grade | 42 | 30 | 72 |
| 2nd Grade | 42 | 44 | 86 |
| 3rd Grade | 36 | 21 | 57 |
| 4th Grade | 44 | 25 | 69 |
| 5th Grade | 43 | 31 | 74 |
| **TOTAL ELEMENTARY** | 239 | 186 | 425 |
| | | | |
| EMR | 3 | 11 | 14 |
| 6th Grade | 53 | 28 | 81 |
| 7th Grade | 41 | 32 | 73 |
| 8th Grade | 48 | 39 | 87 |
| **TOTAL MIDDLE** | 145 | 110 | 255 |
| | | | |
| EMR | 1 | 3 | 4 |
| 9th Grade | 42 | 32 | 74 |
| 10th Grade | 56 | 42 | 98 |
| 11th Grade | 36 | 44 | 80 |
| 12th Grade | 38 | 45 | 83 |
| **TOTAL HIGH** | 173 | 166 | 339 |
| | | | |
| **SYSTEM–WIDE TOTAL** | 557 | 462 | 1019 |